IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SMAJO MESAN, | ) | |
| | ) | No. 31103-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TYSON FOODS INC., | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Smajo Mesan appeals the superior court's order affirming a

decision of the Board of Industrial Insurance Appeals. The board—rejecting the

proposed decision of the industrial appeals judge (IAJ)—found that Mr. Mesan was

entitled to an award for partial permanent disability for an occupational injury to his

shoulder but that he was nonetheless capable of substantial, gainful employment. It

directed that he be compensated for the partial disability but otherwise affirmed the

closing of his two industrial insurance claims by the Department of Labor and Industries

without further time loss or other compensation. In affirming the decision of the board,

the superior court adopted its findings and conclusions.

We find it impossible to perform our proper role on appeal because neither forum

No. 31103-1-III
*Mesan v. Tyson Foods Inc.*

below identified how it resolved disputed material facts bearing on whether Mr. Mesan's

occupational diseases incapacitated him from performing any work at a gainful

occupation. The IAJ did not reach the disputes, given its conclusion that Mr. Mesan's

injury was not fixed and stable and that his claims should be remanded.[1] The relevant

factual findings of the board, adopted by the superior court, are conclusory.

Because the record is inadequate for our review, we reverse and remand the case

to the superior court for more thorough findings and articulation of the basis for its

decision.

## FACTS AND PROCEDURAL BACKGROUND

Mr. Mesan was born in Bosnia-Herzegovina in 1954. There, he graduated from

high school and earned a two-year degree in mechanical engineering. He worked as a

machinist for 15 years before fleeing to Germany when war broke out in his native

country. While interned in a refugee camp in Germany, he was not allowed to work.

In August 2000, he and his family immigrated to the United States. Despite not

speaking or reading English, he worked as a machinist in Kent, Washington for a short

---

[1] In a section of its proposed decision entitled "Issues Not Directly Addressed,"
the IAJ acknowledged that "[d]ue to my decisions on the *below* issues, . . . I only have
peripherally addressed the following issues: geographic relevant labor market; 'odd-lot'
jobs within the meaning of *Allen v. Department of Labor & Indus.*, 16 Wn. App. 692[,
559 P.2d 572] (1977) and *Wendt v. Department of Labor & Indus.*, 18 Wn. App. 674[,
571 P.2d 229] (1977); temporary total disability within the meaning of RCW 51.32.090;
[and] permanent total disability within the meaning of RCW 51.08.160," among others.
Clerk's Papers at 38.

2

time but was laid off; then worked in a warehouse for a time until the work proved too heavy; and finally, in September 2002, began working as a meat cutter for a predecessor to Tyson Foods Inc. at the company's plant in Wallula, Washington.

After working for Tyson for about seven months, Mr. Mesan developed pain and other difficulties in his right shoulder and both hands. Dr. Thomas Burgdorff diagnosed him with trigger finger and eventually recommended surgery, but Mr. Mesan had been diagnosed with diabetes in 2001 and was concerned about slow healing and the risk of complications with healing in light of his diabetes. Dr. Burgdorff placed Mr. Mesan on light duty with permanent restrictions on his left hand.

Mr. Mesan later developed further pain in his right shoulder and in both hands. In January 2005 he filed the first industrial insurance claim involved in this appeal, complaining of a right upper arm and shoulder condition arising from his employment. He filed a second claim in February 2006, alleging a left upper extremity condition which manifested itself between June 19, 2003 and January 31, 2006. He was transferred to light duty jobs. Despite continuing complaints of difficulty with his shoulder, arms, and wrists, he was able to continue working for Tyson in the job position "pick bone sparse lean" until October 2006, when his entire shift was laid off. Tyson has not reinstated the second shift and Mr. Mesan has not obtained work since that time.

The department closed Mr. Mesan's right shoulder claim in November 2008 for time loss compensation that had been paid up to that time. It awarded nothing further for

permanent partial disability. In May 2009, it closed his left upper extremity claim, which

had ultimately resulted in a diagnosis of bilateral carpal tunnel syndrome, having

determined that his condition was stable. It closed the claim without award for time loss

compensation or permanent partial disability. At the time of these decisions, Mr. Mesan

was 54 and 55 years old. Mr. Mesan appealed both closures to the Board of Industrial

Insurance Appeals and they were consolidated for appeal.

The IAJ who heard the claims was persuaded that the proper and necessary

treatment for Mr. Mesan's occupational diseases was the surgeries recommended by Mr.

Mesan's attending physician, Owen Higgs. Dr. Thomas Gritzka, Mr. Mesan's expert,

also agreed, in part, with Dr. Higgs's recommendation of surgery. Yet Mr. Mesan had

consistently and adamantly opposed surgery. The IAJ observed that the department had

not addressed whether Mr. Mesan had "'good cause'" for refusing the surgeries "within

the meaning of the proviso of RCW 51.32.110(2)."[2] Clerk's Papers (CP) at 49.

---

[2] That section provides, in relevant part: "If the worker . . . shall refuse to submit to such medical or surgical treatment as is reasonably essential to his or her recovery . . . , the department or the self-insurer upon approval by the department, with notice to the worker may suspend any further action on any claim of such worker so long as such refusal, obstruction, noncooperation, or practice continues and reduce, suspend, or deny any compensation for such period: PROVIDED, That the department or the self-insurer shall not suspend any further action on any claim of a worker or reduce, suspend, or deny any compensation if a worker has good cause for refusing to submit to or to obstruct any examination, evaluation, treatment or practice requested by the department or required under this section." RCW 51.32.110(2).

4

In its August 2010 proposed order and decision, the IAJ found that both of Mr. Mesan's conditions were in need of further proper necessary treatment, that he had been offered surgeries to treat the conditions, that he refused the surgeries, and that his refusal "deleteriously affected his employability." CP at 56. It reversed the department's decision and remanded with directions to the department to accept the conditions as occupational disease conditions, determine that the offered surgeries "constitute proper and necessary treatment within the meaning of RCW 51.04.030 and 51.36.010," and ask Mr. Mesan, again, if he would submit to the surgeries. CP at 57.

Both parties petitioned the board to review the IAJ's decision. The board accepted review and found the IAJ's disposition improper, stating that "[a]lthough we can appreciate our industrial appeal judge's concerns about Mr. Mesan refusing proper and necessary treatment, we believe that the case law supports fully resolving the issues raised by Mr. Mesan." CP at 10. It observed that the suspension of benefits statute that concerned the IAJ applies only to suspension of benefits during periods of recuperation from an injury, not after the worker's condition is fixed. It held that a review of relevant case law, "leads to the conclusion that Mr. Mesan's refusal of surgery, whether reasonable or not and whether medically necessary and proper or not, gives the Department authority to close his claims." CP at 14.

Having concluded that it could resolve the issues, the board reviewed the medical testimony and found that a preponderance of the evidence supported a conclusion that

5

repetitive work at Tyson had aggravated Mr. Mesan's right shoulder condition and made it symptomatic. Relying on the testimony of Dr. Gritzka, it found an eight percent permanent impairment of the right upper arm and directed the department to require Tyson to pay Mr. Mesan an award equal to eight percent of the amputation value of the arm.

It also determined that a preponderance of the evidence supported a conclusion that Mr. Mesan was capable of substantial gainful employment. While there was conflicting evidence on the extent of Mr. Mesan's occupational diseases, the limitations on work he could perform, the number and type of jobs for which he was qualified, and whether they were available in the relevant labor market, the only factual findings of the board that provided support for its conclusion that Mr. Mesan was not temporarily or permanently totally disabled were

8.  During the period November 4, 2008, through May 6, 2009, the claimant was not prevented from performing reasonably continuous gainful employment[, and]
9.  As of May 7, 2009, Mr. Mesan has not been permanently totally disabled.

CP at 16.

Mr. Mesan appealed the board's decision to the Benton County Superior Court. Following a bench trial, the superior court affirmed the board, adopting its findings of fact, conclusions of law, decision, and order. Mr. Mesan appeals.

ANALYSIS

Mr. Mesan assigns error to the board's finding of fact that he "was not prevented from performing reasonably continuous gainful employment" during the period covered by his claims and its conclusion of law that "[a]s of May 7, 2009, Mr. Mesan was not permanently totally disabled." CP at 16-17 (Finding of Fact 8; Conclusion of Law 7). He argues that viewed in the light most favorable to Tyson, substantial evidence exists that "Mr. Mesan's occupational diseases, in combination with his pre-existing medical conditions, his age, his lack of transferable skills and most importantly his lack of English language skills prevented him from performing *or obtaining* continuous gainful employment." Br. of Appellant at 20.

"[T]he measure of total disability is not the extent of physical impairment, essentially a medical question, but rather the effect of the injury on the worker's 'wage earning capacity'." *Leeper v. Dep't of Labor & Indus.*, 123 Wn.2d 803, 812, 872 P.2d 507 (1994). "To determine a worker's wage earning capacity, the Department must look both at the medical evidence of impairment *and* the empirical evidence of the claimant's ability to obtain a job." *Id.* The evidence bearing on total disability "'necessarily requires a study of the whole man as an individual—his weakness and strengths, his age, education, training and experience, his reaction to his injury, his loss of function and other relevant factors that build toward the ultimate conclusion of whether he is, as a result of his injury, disqualified from employment generally available in the labor

7

market.'" *Id.* at 813 (quoting *Fochtman v. Dep't of Labor & Indus.*, 7 Wn. App. 286, 295, 499 P.2d 255 (1972)).

Nonetheless, Washington cases "require a claimant to show the workplace injury, not fluctuations in the labor market alone, caused the inability to obtain work." *Id.* at 815. In closing Mr. Mesan's claims without an award of time loss or other compensation despite his unemployment, the department implicitly found, and Tyson argues on appeal, that Mr. Mesan's lack of employment is a result of fluctuations in the labor market or a lack of qualifications that is unrelated to his occupational diseases.

On appeal, we review the superior court's decision, not that of the agency. *Dep't of Labor & Indus. v. Slaugh*, 177 Wn. App. 439, 444, 312 P.3d 676 (2013), *petition for review filed*, No. 89667-4 (Wash. Dec. 17, 2013); RCW 51.52.110. Our review is limited to whether substantial evidence supports the trial court's factual findings and then we review, de novo, whether the court's conclusions of law flow from the findings. *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402 (1996).

Findings of fact must be entered in all cases tried without a jury. CR 52. Generally, where findings are required,

> they must be sufficiently specific to permit meaningful review. While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions. The purpose of the requirement of findings and conclusions is to insure the trial judge "'has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully

8

informed as to the bases of his decision when it is made.'" However, a trial court is not required to make findings of fact on all matters about which there is evidence in the record; only those which establish the existence or nonexistence of determinative factual matters need be made.

*In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986) (citations omitted) (quoting *State v. Agee*, 89 Wn.2d 416, 421, 573 P.2d 355 (1977) (quoting *Roberts v. Ross*, 344 F.2d 747, 751 (3d Cir. 1965))).

Mr. Mesan submits that the board's finding 9, although labeled a finding, is really a conclusion of law. In his view, the board failed to enter *any* real findings of fact on the issue of permanent total disability. Br. of Appellant at 21. He suggests that because the board entered only legal conclusions, the facts bearing on permanent total disability "must be reviewed de novo." *Id.*

If a determination concerns whether evidence shows that something occurred or existed, it is properly labeled a finding of fact, but if the determination is made by a process of legal reasoning from facts in evidence, it is a conclusion of law. *State v. Niedergang*, 43 Wn. App. 656, 658-59, 719 P.2d 576 (1986). Stated differently, a finding of fact is "an 'assertion that a phenomenon has happened or is or will be happening independent of or anterior to any assertion as to its legal effect.'" *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 197, 584 P.2d 968 (1978) (internal quotation marks omitted) (quoting *Leschi Improvement Council v. Wash. State Highway Comm'n*, 84 Wn.2d 271, 283, 525 P.2d 774, 804 P.2d 1 (1974)).

We agree with Mr. Mesan that the board's finding 9, that as of May 7, 2009 "Mr. Mesan has not been permanently totally disabled," is a determination of the legal effect of Mr. Mesan's medical/vocational situation and is a conclusion of law. The board's finding 8, that during the period November 4, 2008 through May 6, 2009, "the claimant was not prevented from performing reasonably continuous gainful employment," is a finding of *ultimate* fact but is not much more helpful than finding 9 in indicating how the board or the superior court resolved the several key factual disputes bearing on Mr. Mesan's ability to perform or obtain reasonably continuous gainful employment. Finding 8, standing alone, is not sufficiently specific to permit meaningful review.

RCW 51.52.104 provides that an IAJ's proposed decision and order "shall contain findings and conclusions *as to each contested issue of fact and law*." (Emphasis added.) Where review is granted by the board, RCW 51.52.106 similarly provides that the board's final decision and order shall contain findings and conclusions as to each contested issue of fact and law, as well as the board's order based thereon. Ultimately, a trial court's findings must inform us "'what questions were decided by the trial court, and the manner in which they were decided.'" *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 707, 592 P.2d 631 (1979) (internal quotation marks omitted) (quoting *Bowman v. Webster*, 42 Wn.2d 129, 134, 253 P.2d 934 (1953)).

We disagree with Mr. Mesan's suggestion that—faced with no indication how the board or the superior court resolved the key factual disputes—we should decide them de

10

novo. On review, it is improper for an appellate court to search out a material or ultimate finding of fact from the evidence in the record because it would place the court in the initial decision-making process rather than maintaining its function of review. *Wold v. Wold*, 7 Wn. App. 872, 876, 503 P.2d 118 (1972). When further findings of fact and conclusions of law are necessary for appellate review, remand for their entry is appropriate. *Little v. King*, 160 Wn.2d 696, 707, 161 P.3d 345 (2007).

While this court's role is limited to reviewing the decision-making process, not resolving disputed issues, the superior court conducts a de novo review of the board's record. The board's decision may be modified by the superior court if the court concludes, by a preponderance of the evidence, that its findings and conclusions are incorrect. *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 5, 977 P.2d 570 (1999). We therefore remand this matter to the superior court, as a trier of fact, for the entry of additional findings regarding the contested issues relating to whether Mr. Mesan was temporarily totally disabled between November 4, 2008 and May 6, 2009 and permanently totally disabled as of May 7, 2009. What is needed are findings indicating how the court resolved the several material disputes within the medical and vocational testimony. We recognize that further proceedings could conceivably include remand by the trial court to the board. *Cf. Boeing Co. v. Gelman*, 102 Wn. App. 862, 870-71 & n.20, 10 P.3d 475 (2000) (holding that a court is empowered to order an agency to comply with the law by providing needed findings of fact).

11

No. 31103-1-III
*Mesan v. Tyson Foods Inc.*

Mr. Mesan requests attorney fees under RAP 18.1, RCW 51.52.130, and *Brand v. Department of Labor & Industries*, 139 Wn.2d 659, 989 P.2d 1111 (1999). Under RCW 51.52.130 workers who successfully obtain a reversal or modification of a department decision may be awarded attorney fees. *Oien v. Dep't of Labor & Indus.*, 74 Wn. App. 566, 571, 874 P.2d 876 (1994). In *Sacred Heart Medical Center v. Knapp*, this court held that a decision remanding an industrial insurance matter for further fact finding cannot be construed as affording additional relief. 172 Wn. App. 26, 29, 288 P.3d 675 (2012), *review denied*, 177 Wn.2d 1021 (2013). As in *Knapp*, Mr. Mesan has not yet succeeded on appeal and is not yet entitled to fees under RCW 51.52.130.

Reversed and remanded for further proceedings consistent with this opinion.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.P.T.

12

APPENDIX

The following summary of evidence illustrates the several material factual disputes that bear on the ultimate issues of Mr. Mesan's alleged total temporary and permanent disability. It is not intended to bind anyone but is provided for the convenience of the court and the parties.

**Medical Testimony**

*Dr. Owen Higgs (Attending Physician)*

Dr. Owen Higgs was Mr. Mesan's treating orthopedist for Mr. Mesan's industrial injury claims. He first saw Mr. Mesan in October 2005 for conditions including a trigger finger on his left hand. He testified that Mr. Mesan suffered from moderate bilateral carpal tunnel syndrome in both hands. Dr. Higgs also testified that Mr. Mesan suffered from a right shoulder impingement. He prescribed braces and anti-inflammatory medication and offered surgery for which he felt the prognosis was "very good" but Mr. Mesan did not want the shoulder or wrist surgery. CP at 187-90.

Dr. Higgs found it appropriate to place some permanent restrictions on Mr. Mesan based on his injuries. He stated that he should only occasionally lift 15 pounds from shoulder to overhead, 20 pounds from floor to waist, and 20 pounds from waist to shoulder height. Dr. Higgs added that Mr. Mesan would be able to lift 14 pounds from floor to waist frequently and that he could carry 25 pounds occasionally and 15 pounds frequently. He concluded stating that Mr. Mesan could occasionally push 40 pounds, frequently push 20 pounds, and occasionally pull 35 pounds and frequently pull 15 pounds. Such limitations were permanent in nature unless corrected. CP at 197-200.

Dr. Higgs worked with vocational counselor Maurilio Garza on Mr. Mesan's vocational issues. When Mr. Garza presented Dr. Higgs with whether Mr. Mesan could perform the job of injury, pick bone sparse lean, Dr. Higgs stated that he could perform the job without restrictions on a permanent basis. The other four jobs were not presented to Dr. Higgs because in doing vocational assessments the job of injury is assessed first. CP at 206, 533-35.

*Mr. Kirk Holle (Physical Therapist)*

During the course of treatment, Dr. Higgs recommended that Mr. Mesan go through a physical capacities evaluation (PCE) by Mr. Kirk Holle. The PCE was

conducted on April 20, 2007. Mr. Holle concluded that Mr. Mesan could work an eight-hour day in light physical demand jobs with no frequent overhead and waist to shoulder lifting. Specifically the PCE provided that Mr. Mesan could work in an occupation that only requires occasional reaching above the shoulder with weights of 15 pounds and that he can perform occasional fine manipulation. He can lift 20 pounds occasionally from 4 inch height to 36 inch height to 56 inch height, and lift 15 pounds occasionally from 56 inch height to 78 inch height. He can frequently lift between 14 pounds from 4 inch height to 36 inch height, and then did not provide weight for frequently lifting about 36 inches. Mr. Holle disapproved of all of the job analyses provided by Mr. Garza. His concern was with the repetitive constant to occasional frequent handling and reaching. CP at 238, 418-19, 563-64, 582, 595.

*Drs. Walter Fife and Eugene Wong*

On May 6, 2008, Mr. Mesan was examined by Drs. Walter Fife and Eugene Wong at the request of Tyson Foods. Drs. Fife and Wong concluded in their report that Mr. Mesan was limited to sedentary work and could not work for extended periods of time holding his arms up. Dr. Fife testified that Mr. Mesan had limited range of motion in his neck and that his right shoulder had only about half of the normal rotation it should have. He also noted that Mr. Mesan has restrictions in both of his wrists. In their report the doctors restricted Mr. Mesan to work that he could complete sitting down with his elbows at his side. When testifying however, Dr. Fife opined that Mr. Mesan was fully capable of performing all production jobs. Dr. Fife and Dr. Wong disapproved of the job analyses for warehouse worker and forklift operator in part due to Mr. Mesan's neck and back arthritis. CP at 240, 397-99, 401, 407-09, 569-70, 587.

*Dr. William Bozarth (Independent Medical Examination (IME) Panel)*

In May 2007, Dr. William Bozarth a neurologist, Dr. Stephen Sears, and Dr. Peter Zografos conducted a panel IME. Dr. Bozarth diagnosed Mr. Mesan with right shoulder pain, most likely due to impingement. Dr. Bozarth opined that this injury was not work related, but rather something Mr. Mesan was born with. They also diagnosed Mr. Mesan with multiple and diffuse pain complaints, including both hands and both wrists, pain in the neck and lower back, and buzzing in the right ear. Dr. Bozarth did not diagnose Mr. Mesan with carpal tunnel syndrome. The panel concluded that there was no permanent partial impairment or disability and based on the examination the panel determined that no restrictions were necessary. The panel determined that Mr. Mesan could perform the jobs forklift, pick from mixed lean belt, pick bone sparse lean, peel cap, and warehouse worker on a reasonably continuous gainful basis. The panel concluded that Mr. Mesan

had no evidence of a permanent partial impairment and/or disability. CP at 237, 503-05, 512.

*Dr. Thomas Gritzka*

Dr. Thomas Gritzka, a certified orthopedic doctor, examined Mr. Mesan on May 6, 2009 at Mr. Mesan's attorney's request. Dr. Gritzka found a positive impingement sign in Mr. Mesan's right shoulder. He also found upper extremity sensory impairment consistent with diabetic peripheral neuropathy. Dr. Gritzka agreed with Dr. Higgs that Mr. Mesan would be a good candidate for arthroscopic surgery. In addition to the bilateral carpal tunnel syndrome and shoulder impingement, Dr. Gritzka diagnosed chronic cervical and lubosacral sprains, but noted the examination was basically normal. He recommended no treatment for the carpal tunnel syndrome. CP at 224, 253, 258, 264-65.

Dr. Gritzka stated that if Mr. Mesan is put in a position where he has to keep his head and neck bent forward or has to lean over a conveyor belt for an extended period of time that this back pain is likely to recur and cause problems. Dr. Gritzka opined that Mr. Mesan is best suited for sedentary work and that he needs to be in a work environment where he can be self-paced and allowed to change positions as needed. Dr. Gritzka stated he should avoid working a desk, or at a job where he would have to sit and look at a computer screen, or any job that requires repetitive hand activities, pulling things on and off a production line or continual keyboarding. He testified that Mr. Mesan could perform sedentary to light sedentary work. Therefore none of the recommended jobs would really be appropriate for Mr. Mesan. Dr. Gritzka ultimately rated Mr. Mesan at eight percent impairment for the right upper extremity. CP at 266-68, 270-71, 277, 570-71, 583.

In summary, the expert medical testimony varied from doctors suggesting that Mr. Mesan could not perform any job at Tyson (Dr. Gritzka) to the suggestion that Mr. Mesan needed no restrictions and could perform any job at Tyson (Dr. Bozarth). There appeared to be no clear consensus amongst the medical experts regarding Mr. Mesan's physical ability.

**Vocational Testimony**

*Maurilio Garza*

Mr. Maurilio Garza, a certified vocational expert, met with Mr. Mesan once on October 20, 2006. Mr. Garza determined there were five jobs Mr. Mesan could perform. The first two were chosen because of his past work history: (1) warehouse worker and (2) forklift driver. Additionally, he identified three jobs unique to the Tyson plant for which he was qualified: (3) pick bone sparse lean; (4) bone picker; and (5) meat trimmer. The first three jobs offered were not part of the general labor market, but were unique to Tyson. Mr. Garza asserted that Mr. Mesan could complete the job of pick bone sparse lean, pick special trim, or pick mixed lean while adhering to the limitations articulated by Mr. Holle and Dr. Higgs. Mr. Garza agreed that Mr. Mesan is incapable of physically performing the warehouse worker and forklift operator positions. Mr. Garza did not conduct a labor market study. Nonetheless, Mr. Garza concluded that Mr. Mesan was employable on a reasonably continuous basis at Tyson with no accommodation at the position of pick bone sparse lean. CP at 543-44, 552, 576-77, 582.

Mr. Garza also testified that Mr. Mesan is an educated individual. He has a high school diploma, a college degree, and could learn a foreign language. Mr. Garza testified that five jobs would be appropriate for Mr. Mesan, mixed lean belt, peel cap, pick bone sparse lean, warehouse worker, and forklift operator. Mr. Garza ultimately opined that based on his analysis Mr. Mesan could be gainfully employed on a reasonably continuous basis. He testified that no opinion indicated that Mr. Mesan was permanently totally disabled. CP at 530, 552, 554.

*Jill Falk*

Mr. Mesan called vocational rehabilitation counselor, Jill Falk. Ms. Falk met with Mr. Mesan twice at the request of counsel. Ms. Falk did a thorough record review regarding Mr. Mesan's background. She completed a full intake of Mr. Mesan's background, work history, and reviewed his medical records and PCE. She offered testimony in stark contrast to that of Mr. Garza. CP at 295, 307-10.

She testified that Mr. Mesan was unable to work because none of the jobs suggested were considered sedentary. But agreed that all medical experts had indicated that they felt Mr. Mesan was capable of work in some capacity. Ms. Falk testified that Mr. Mesan was permanently and totally disabled when taking into account his injuries, age, lack of English skills, and singular work history. Ms. Falk felt that due to the

16

physical restrictions, his transferable skills, work history, education, and language ability, that Mr. Mesan is permanently and totally disabled. Ms. Falk did not conduct a labor market study because it was unnecessary to reach that question, when Mr. Mesan was unable to perform any of the positions suggested for his employment. CP at 334, 340-47, 351-52.

**Lay Testimony**

Mr. Mesan testified that he does not understand English and requires the use of interpreters when he goes to see a doctor or his attorney. He also testified that prior to working at Tyson he had no injuries that limited him from working. Since working at Tyson he has problems with his hands, right shoulder, and his neck and back. Several doctors offered or recommended surgery to help correct his ailments, however, he declined such suggestions because of the risk of surgery and the fact that nobody guaranteed he would be better off. CP at 16, 145, 151-53.