# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| BRANDON FOSTER, | No.  49475-2-II |
| Appellant, | UNPUBLISHED OPINION |
| v. | |
| FRITO-LAY INC., | |
| Respondent. | |

BJORGEN, C.J. — Brandon Foster appeals the superior court order affirming the Board of Industrial Insurance Appeal's (Board) determination that he was not totally and permanently disabled.[1]  Foster argues that the superior court erred in denying his motions (1) for a directed verdict determining that he was a permanently and totally disabled individual and (2) for a partial directed verdict determining that he was not capable of performing and obtaining work as a pallet jack order filler.  He also requests attorney fees on appeal.  For the reasons below, we hold that the superior court did not err in either

---

[1] Foster also appeals the superior court's denial of his summary judgment motion.  In his reply brief, however, Foster states, "Whether or not this Court can review the denial of summary judgment may have academic import, but has no practical effect on the outcome of this appeal." Reply Br. of Appellant at 17-18.  Because Foster concedes that reviewing the summary judgment motion separately will have no practical effect on the outcome of this appeal, we decline to address this issue.

determination, and we deny Foster's request for an award of attorney fees. Accordingly, we affirm.

FACTS

I. BACKGROUND

On April 20, 2010, Foster suffered a left eye injury while working as a driver for his employer, Frito-Lay Inc. He subsequently opened a claim for workers' compensation benefits with the Department of Labor and Industries (Department).

On February 7, 2014, the Department closed the claim with time loss compensation paid to Foster through January 29, 2014. The Department also found that he no longer needed medical treatment and that he was not entitled to a permanent partial disability award. Foster protested the February 17 order. On May 5, the Department affirmed its order. On May 16, Foster appealed that order to the Board.

II. EVIDENCE PRESENTED TO THE BOARD

The Board outlined the three issues before it, each dealing with the effects of Foster's 2010 injury: (1) whether Foster was a totally and temporarily disabled worker during the period January 30, 2014 through May 5, 2014, (2) what degree of permanent partial disability best described Foster's residual impairment, and (3) whether Foster was a totally and permanently disabled worker as of May 5, 2014.[2]

At the Board hearing, Foster presented evidence through the deposition of Dr. Bruce Wojciechowski, an optometrist, the testimony of Todd Martin, a vocational rehabilitation

---

[2] The parties also agreed that one of the issues was whether Foster required further proper and necessary medical treatment. However, Foster later withdrew this issue.

counselor, and the testimony of Foster himself. To aid in determining what, if any jobs, Foster could reasonably carry out, he also submitted exhibits outlining five positions: construction laborer, bulk order picker/restocker, materials handler-belt picker, materials handler-belt loader, pallet jack order filler.[3]

Wojciechowski concluded that Foster's industrial injury caused him to have photophobia,[4] diminished visual acuity of 20/40 to 20/80 in his left eye, diplopia,[5] and exotropia.[6] He also stated that these eye-related disabilities impeded Foster's ability to succeed at each of the five occupations.

Martin testified that, assuming Foster's diplopia and exotropia diagnoses were accurate, he would not be capable of performing all the requirements of the five occupations. As to the pallet jack order filler position specifically, Martin testified:

> Pallet Jack operation is very different than forklift operation. That's a manual jack that is pushed around a floor. *It's possible he might be able to do that.*
> However . . . *pallet jack operation it's not something that's commonly found in the labor market where that's all that individual is doing.* Typically, pallet jack operation you see a lot of times is with distributing companies where someone like Pepsi is bringing their product out to a store. The driver is unloading it via a pallet jack and then transporting it into the store.
> *That's more likely where you see pallet jacks used. So, it would entail more driving positions.*

Certified Appeals Board Record (CABR) at 29 (emphasis added).

---

[3] Unless otherwise indicated, these five positions will be collectively referred to as the "five occupations."

[4] Photophobia refers to sensitivity to light.

[5] Diplopia refers to double vision.

[6] Exotropia refers to eye drifting.

In response to counsel's follow-up question about Foster's ability to drive a vehicle in light of his vision difficulties, Martin testified:

> I would say that question would need to be posed to a treating physician for them to opine if he would be able to do that.
> My concern would be, being a courier or light delivery driver, it's not uncommon to have to drive different times of the day in different weather conditions. . . . If he has difficulties with driving in days when its sunny, or driving at night due to headlights, he likely would not be able to do that job. In addition, I would anticipate that employers would have a significant concern about employing an individual who has double vision such as Mr. Foster due to liability issues, insurance issues.

CABR at 30. Martin also testified that Foster had the transferable skills to perform other jobs, such as an auto courier, roofer, carpenter, route sales driver, merchandiser, and a laborer on a road crew.

Foster testified consistently with Martin's and Wojciechowski's conclusions. He also admitted that he still drives his vehicle, though the weather can make it difficult to drive with his visual disabilities. On cross-examination, Frito-Lay elicited from Foster that he had no restrictions on his driver's license.

After Foster rested his case, Frito-Lay presented evidence through the depositions of Dr. William Shults and Dr. William Baer, ophthalmologists. After performing two medical examinations on Foster, Shults concluded that Foster likely had intermittent exotropia and diplopia, as well as moderate depth perception problems. Shults also opined that Foster's claimed diminished visual acuity was called into question by the result of the cross cylinder test. Shults explained that this test is administered with both eyes open so that patients cannot tell which eye is being tested. Shults opined that through this test, the examiner can

> determine whether the patient is telling the truth. And in this case on a day when he was claiming to be able to see no better than 20/60 he was, in fact, able to see at

a 20/30 level, and so that tells you that he's not giving his best effort in providing the visual acuity data in his left eye.

CABR (Shults Deposition) (Sept, 17. 2014) at 21-22.

Baer also examined Foster twice. After the second examination, Baer opined that Foster had intermittent exotropia, but that it was probably pre-existing, as well as a "[h]istory of visual field defect, anomalous in nature." CABR (Baer Deposition) at 19. Baer further opined that even with his intermittent exotropia he was likely able to be employed in one of the five occupations. Baer also believed that Foster could do office work, such as on a computer. On cross examination, Foster's attorney elicited from Baer that Foster's depth perception issues may interfere with his ability to perform jobs.

Frito-Lay also admitted the deposition of James Ellis, a private investigator, and accompanying video surveillance footage[7] that he had recorded. In general, the video surveillance shows Foster on multiple occasions after the time of his injury driving his vehicle to and from various locations with little to no problems. The video surveillance also showed Foster loading and unloading large pieces of wood from a truck and delivering them to his friend's business. The video surveillance further showed that Foster was not wearing any kind of protective eye wear or a visor to protect his eyes, which would purportedly help someone with photophobia.

---

[7] In his opening brief, Foster stated that the surveillance videos were not part of the appellate record. However, this is incorrect.

III. THE BOARD'S DECISION

The Board issued a decision and order with the following pertinent findings of fact and conclusions of law:

FINDINGS OF FACT

. . . .

4. Brandon Foster had no physical restrictions caused by the industrial injury, from January 30, 2014, through May 5, 2014, and as of May 5, 2014.

5. Brandon Foster was and is able to perform the [five occupations] from January 30, 2014, through May 5, 2014, and as of May 5, 2014.

6. Brandon Foster was able to perform and obtain gainful employment on a reasonably continuous basis from January 30, 2014, through May 5, 2014, and as of May 5, 2014.

7. As of May 5, 2014, Brandon Foster's condition(s) proximately caused by the industrial injury were fixed and stable.

8. Medical findings of 20/25-2 diminution of the left eye visual acuity with intermittent exotropia and diplopia support a permanent partial disability award.

9. On May 5, 2014, Brandon Foster had a permanent partial disability proximately caused by the industrial injury equal to 20 percent of total bodily impairment.

CONCLUSIONS OF LAW

. . . .

2. Brandon Foster was not a temporarily totally disabled worker within the meaning of RCW 51.32.090 from January 30, 2014, through May 5, 2014.

3. Brandon Foster was not a permanently totally disabled worker within the meaning of RCW 51.08.160, as of May 5, 2014.

4. On May 5, 2014, Brandon Foster had a permanent partial disability, within the meaning of RCW 51.32.080, proximately caused by the industrial injury.

5. The Department order dated May 5, 2014, is incorrect and is reversed. This matter is remanded to the Department to issue an order finding that the

claimant was not entitled to time-loss compensation benefits from January 30, 2014, through May 5, 2014. Brandon Foster was not a permanently and totally disabled worker within the meaning of RCW 51.08.160, as of May 5, 2014. The self-insured employer is ordered to pay a permanent partial disability award equal to 20 percent of total bodily impairment, less prior awards, if any, and to close the claim.

CABR at 54-55.

Both Foster and Frito-Lay filed a petition for review of this order. On April 27, 2015, the Board denied review.

IV. SUPERIOR COURT LITIGATION

Both parties appealed to the superior court and stipulated to consolidate their appeals. Foster moved for summary judgment, arguing that there was no genuine issue of material fact that he was a permanently totally disabled worker. Frito-Lay opposed the motion, contending that were genuine issues of material fact and a reasonable person could conclude that Foster was not totally permanently disabled. The trial court denied Foster's summary judgment motion, stating in its written order that there are

genuine material issues of fact concerning plaintiff's credibility which is the foundation for the opinions of plaintiff's expert witnesses and plaintiff's ability to obtain and perform gainful employment.

Clerk's Papers (CP) at 57.

Frito-Lay subsequently stipulated to dismiss its appeal, which had contested the Board's determination that Foster was entitled to a 20 percent partial permanent disability award. Foster and Frito-Lay proceeded to a jury trial.

The CABR, as already detailed in Part II above, was read to the jury and exhibits contained therein were admitted. At the end of this evidence, Foster moved for a directed verdict and a partial directed verdict.

7

In his directed verdict motion, Foster argued that there was not substantial evidence to show that he could obtain work in light of his eye-related disabilities. The superior court disagreed, primarily on the basis of the video surveillance footage showing Foster's ability to do work as a "handyman," and denied his motion for a directed verdict. CABR (Transcripts) at 56-57.

As to the motion for a partial directed verdict, Foster argued that no evidence supported the Board's finding that he could work as a pallet jack filler picker.[8] Foster pointed out that Martin's testimony was unrebutted "that this is not a complete job in the labor market . . . [and] is . . . paired with other job duties that involve driving." CABR (Transcripts) at 47. The superior court denied the motion "because a reasonable juror could conclude that Mr. Foster was capable of obtaining and performing work as a Pallet Jack Operator,"[9] and allowed the jury to consider that position in its deliberations. CP at 89-90.

---

[8] In its motion for partial directed verdict, Foster had also argued that the Board's order was silent as to Foster's ability to work as an over-the-road "bin driver and . . . forklift operator," and Frito-Lay did not challenge this omission. CABR (Transcripts) at 32. The superior court agreed and excluded these jobs from the jury's consideration. This determination is not challenged on appeal.

Foster also argued that the evidence did not support him working as maintenance mechanic. The superior court granted the motion as to maintenance mechanic because the only evidence presented, by way of Martin, "concluded he did not possess the skills, education, knowledge or experience to obtain such employment." CP at 89. The court thus excluded the maintenance mechanic position from the jury's consideration. This determination is not challenged on appeal.

Finally, the superior court also informed the jury that Foster had a restriction related to his inability to obtain a commercial drivers' license. This determination is not challenged on appeal.

[9] This position is also apparently called a "pallet jack order filler." CP at 89-90. Neither party argues that there is a difference between a pallet jack operator and a pallet jack order filler.

The jury determined that the Board was correct in deciding that the industrial injury did not make (1) Foster temporarily totally disabled between January 30 and May 5, 2014 or (2) permanently totally disabled as of May 5, 2014. The jury also determined that the Board was correct in deciding that Foster had a permanent partial disability equal to 20 percent of total bodily impairment as of May 5, 2014. Based on the jury's verdicts, the superior court affirmed the Board's order.

Foster appeals the superior court's denial of his motions for a directed verdict and partial directed verdict and its subsequent order affirming the Board.

## ANALYSIS

### I. STANDARD OF REVIEW

In all court proceedings under or pursuant to the Industrial Insurance Act (IIA), Title 51 RCW, "the findings and decision of the board shall be prima facie correct and the burden of proof shall be upon the party attacking the same." RCW 51.52.115. Further, in an industrial insurance appeal, "the practice in civil cases shall apply to appeals. . . . Appeal shall lie from the judgment of the superior court as in other civil cases." RCW 51.52.140. We thus review the superior court's ruling under the standard applicable rules governing a directed verdict on appellate review. *See Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 619, 285 P.3d 187 (2012).[10]

"We review motions for judgment as a matter of law de novo." *Joy*, 170 Wn. App. at 619. Under CR 50(a)(1),

---

[10] *Joy* refers to a directed verdict as a "motion[] for judgment as a matter of law." *Joy*, 170 Wn. App. at 619.

> [i]f, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

"On review of a ruling on a motion for a directed verdict, the appellate court applies the same standard as the trial court." *Chaney v. Providence Health Care*, 176 Wn.2d 727, 732, 295 P.3d 728 (2013). "A directed verdict is appropriate if, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." *Id.* "Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true." *Joy*, 170 Wn. App. at 619 (internal quotation marks omitted). A directed verdict "'can be granted only when it can be said, as a matter of law, that there is no competent and substantial evidence upon which the verdict can rest.'" *Guijosa v. Wal-Mart Stores, Inc.,* 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting *State v. Hall*, 74 Wn.2d 726, 727, 446 P.2d 323 (1968)).

## II. DIRECTED VERDICT – PERMANENT TOTAL DISABILITY

Foster argues that once he made a prima facie case that he had a permanent total disability, the burden of proof shifted to Frito-Lay to show that he was capable of both performing *and obtaining* employment in light of his vision-related impairments. We disagree.

A.    Legal Principles

"'Permanent total disability' means loss of both legs, or arms, or one leg and one arm, total loss of eyesight, paralysis or other condition permanently incapacitating the worker from performing any work at any gainful occupation." RCW 51.08.160. In interpreting this definition, the case law recognizes that "the purpose of workers' compensation, *and the principle*

10

*which animates it*, is to insure against the loss of wage earning capacity. Adherence to this principle focuses disability hearings on the particular claimant's ability to work in the competitive labor market." *Leeper v. Dep't of Labor & Indus.*, 123 Wn.2d 803, 814, 872 P.2d 507 (1994). The definition of "total disability" thus has a medical aspect, *i.e.*, the extent of physical impairment, and an economic aspect, *i.e.*, the effect on wage earning capacity. *Adams v. Dep't of Labor & Indus.*, 128 Wn.2d 224, 230, 905 P.2d 1220 (1995) (citing *Leeper*, 123 Wn.2d at 812.) These two aspects have been combined in a previously approved jury instruction that states: "'[A] worker is totally disabled if unable to perform or obtain regular gainful employment[.]'" *Adams*, 128 Wn.2d at 230 (quoting former WASHINGTON PRACTICE (WPI), 155.07 (3d ed. 1989)) (approved by *Leeper*).[11]

In *Fochtman v. Department of Labor and Industries*, 7 Wn. App. 286, 294, 499 P.2d 255 (1972)), we characterized total disability as

> a hybrid quasi-medical concept in which there are intermingled in various combinations, the medical [f]act of loss of function and disability, together with the inability to perform and the inability to obtain work as a result of his industrial injury.

Citing *Fochtman*, our Supreme Court in *Leeper*, 123 Wn.2d at 814-15 set out a "whole person" approach to determine the degree and extent of an individual's disability:

> the appropriate measure of disability requires a study of the whole person-weaknesses and strengths, age, education, training and experience, reaction to the injury, loss of function, and other factors relevant to whether the worker is, as a result of the injury, disqualified from employment generally available in the labor market. *See Fochtman*, 7 Wn. App. at 295. . . . The trier of fact must determine

---

[11] The language of WPI 155.07 has been updated since *Leeper* and *Adams* to state, "Total disability is an impairment of mind or body that renders a worker unable to perform or obtain a *gainful occupation with a reasonable degree of success and continuity*." (Emphasis added.)

from all relevant evidence whether an injury has left the worker totally disabled.

Relevant evidence as to whether an injury has resulted in permanent total disability includes

testimony from a vocational expert regarding the worker's inability to obtain work in the labor

market due to his injury. *Fochtman*, 7 Wn. App. at 295; *Leeper*, 123 Wn.2d at 813.

In discussing how a claimant proves permanent total disability, *Kuhnle v. Department of Labor and Industries*, 12 Wn.2d 191, 199, 120 P.2d 1003 (1942), drew a distinction between an injured employee who "'can do light work of a general nature'" and one who "'is only fitted to do 'odd' jobs, or special work, not generally available'":

> "In the former, the burden is on the petitioner; the presumption being that his inability to obtain employment is due to the fluctuations in the labor market and not to the consequences of the accident. In the latter, the burden is on the employer to show that such special work is available to the petitioner."

(quoting *White v. Tennessee Consol. Coal Co.*, 162 Tenn. 380, 385, 36 S.W.2d 902 (1931)).

In *Leeper*, the Washington Supreme Court restated this rule from *Kuhnle*, referred

to as the "odd lot doctrine," in the following terms:

> Under this rule, a claimant must prove he or she is incapable of performing light or sedentary work of a general nature. If the claimant proves this, the burden of proof shifts to the Department, and it must show odd jobs or special work exist in the local labor market that the claimant could obtain. *Kuhnle*, 12 Wn.2d at 199.

*Leeper*, 123 Wn.2d at 815 (emphasis omitted). To shift the burden to the Department under the

odd lot doctrine, the claimant must make a prima facie case of disability. *Id*. *Leeper* is

consistent with the court's prior decision in *Spring v. Department of Labor and Industries*, 96

Wn.2d 914, 919, 640 P.2d 1 (1982) (emphasis omitted), which held that

> Spring met the burden of proving that he could not obtain and maintain employment of a general light and/or sedentary nature. The burden then shifted to the employer to prove that odd lot or special work of a nongeneral nature was available to Spring.

In short, the burden remains with the claimant to show total permanent disability, unless he makes a prima facie showing under the odd lot doctrine that he cannot maintain employment of a general light/and or sedentary nature. If the claimant shows this, the burden shifts to the employer to show that special work of a nongeneral nature would be available to him. The case law Foster presents does not call this approach into question.[12] [13]

B.      Application of the Odd Lot Doctrine

Foster argues that he met his prima facie case to show total disability through the testimony of Wojciechowski and Martin that his intermittent exotropia, diplopia, and diminished visual acuity in his left eye prevented him from being employed in one of the five occupations.

---

[12] In his reply brief, Foster argues that *Graham v. Weyerhaeuser Co.*, 71 Wn. App. 55, 60, 856 P.2d 717 (1993), *overruled in part by Leeper*, 123 Wn.2d 803, "clearly required labor market evidence to prove employability." Reply Br. of Appellant at 2. The cited portion of *Graham* states:
> Whether work is general or special depends on whether it is generally available on the competitive labor market. General work is work, including light or sedentary work that is reasonably continuous within the range of the worker's capabilities, training, education and experience and generally available on the competitive labor market

(Emphasis omitted.) This standard indicates that whether work is available on the labor market is relevant, but it does not state that it is the employer's burden to prove availability beyond that set out in the odd lot doctrine.

[13] Foster also argues that under the third prong of *Leeper*, Frito-Lay must present evidence that he can obtain work in the labor market. The third prong, which is more akin to a conclusion, states:
> Third, our opinions *require a claimant to show* the workplace injury, not fluctuations in the labor market alone, caused the inability to obtain work. *If the claimant* shows the injury in some part caused the inability to obtain work, then *the failure to obtain work is relevant evidence of total disability*.

The third conclusion in *Leeper* reflects that it is the claimant's burden to show that an injury impairs his ability to obtain work. It does not shift the burden to the employer to prove the availability of jobs beyond that established in the odd-lot doctrine approved by *Leeper*.

Foster also points out that Baer, Frito-Lay's expert, stated that a job involving use of depth perception may be difficult to accomplish for Foster. Thus, Foster contends, the burden shifted to Frito-Lay to provide substantial evidence that he could *obtain* work in light of his work restrictions.

Under the odd lot doctrine, however, only if Foster had shown that he could not obtain and maintain employment of a general light and/or sedentary nature would Frito-Lay have been required to show special work of a nongeneral nature that was available to him. *Chaney*, 176 Wn.2d at 732; *Leeper*, 123 Wn.2d at 815; *Spring*, 96 Wn.2d at 919. The record discloses multiple issues of fact as to whether Foster made this showing.

First, even if we assume that the five occupations were examples of light or sedentary work of a general nature, whether Foster's disabilities prevented him from performing these jobs was plainly disputed. Baer testified that even with his intermittent exotropia, Foster could still work in any of the five occupations. Martin, on the other hand, testified that Foster would be unable to perform any of the five occupations, assuming that Wojciechowski's conclusion regarding Foster's disabilities was true. The parties' experts also disagreed as to whether Foster could do office work, such as using a computer. Common sense would dictate that an office job would fall into the category of a general light and/or sedentary nature. *See Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 132, 913 P.2d 402 (1996).

Perhaps more to the point, Martin, Foster's expert, testified that Foster had the transferable skills to perform jobs other than the five occupations, such as auto courier, roofer, carpenter, route sales driver, merchandiser, and a laborer on a road crew. Taking that at face

value, Foster has not shown that he is unable to perform light or sedentary work under the odd lot doctrine.

Further, as Frito-Lay argues, both Martin's and Wojciechowski's opinions were grounded on the veracity of Foster's representation of his condition. Although it was undisputed that Foster had some disability, Frito-Lay presented a case that consistently undermined Foster's credibility. Shults testified that the cross cylinder test showed that he had exaggerated his visual impairment. The videos of Foster showed that he was driving to different locations and performing tasks without eye protection, which would have purportedly helped with his photophobia. Because both Martin's and Wojciechowski's opinions were based on Foster's credibility, those opinions were compromised by the questions raised about Foster's credibility. Foster has failed to present a prima facie case sufficient to shift the burden of persuasion under the odd lot doctrine.

Foster also argues that even if he did not meet his burden as a matter of law under the odd lot doctrine, the standards governing permanent total disability should be modified. Specifically, he argues that because it was undisputed that he had some work restrictions, the employer was required to put evidence on that he could obtain work in light of those work restrictions.

Foster cites to former RCW 51.32.095 (2008) for the proposition that his employer was required to present a "specific vocational opinion . . . that there are sufficient employers willing and able to hire workers similar to the injured worker." Br. of Appellant at 20-21. Former RCW 51.32.095, however, dealt with the priority of vocational rehabilitation services that should be provided to an injured worker when such services are necessary and likely to enable the injured worker to become employable. WAC 296-19A-020; *see also Winchell's Donuts v. Quintana*, 65

15

Wn. App. 525, 526-27, 828 P.2d 1166 (1992). Nothing in former RCW 51.32.095 indicated that an employer is *required* to put on labor market evidence to rebut permanent and total disability.

Foster also cites to several Department regulations, WAC 296-19A-065, -070, and -140, as further supporting the view that the employer carries the burden to show that Foster can achieve gainful employment in the market. These rules are related to former RCW 51.32.095. They set forth how vocational rehabilitation providers may complete assessment reports, WAC 296-19A-070(2), which require "labor market" information, WAC 296-19A-140, in order for an employer to determine whether an injured worker should receive vocational rehabilitation services, WAC 296-19A-065. However, the relevancy of labor market information to the determination whether vocational rehabilitation services are needed does not imply that an employer must present labor market information when an injured worker is claiming a permanent total disability.

Foster's arguments from these statutes and rules do not warrant our spurning the odd lot doctrine and crafting a standard contrary to well-established opinions such as *Leeper*. We decline the invitation.

C.      Conclusion

Foster appeals the trial court's denial of his motion for a directed verdict. As noted, "[a] directed verdict is appropriate if, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." *Chaney*, 176 Wn.2d at 732. Foster argues this standard is met because the burden of persuasion shifted to Frito-Lay under the odd lot doctrine and Frito-Lay presented no evidence that work was available to Foster.

16

With the evidence that Foster was able to perform jobs other than the five listed occupations, the conflicting evidence whether he was able to perform the five occupations and office work, and the expert opinion that Foster had exaggerated his visual impairment during testing, we cannot say that Foster made a prima facie showing that he was incapable of performing light or sedentary work of a general nature. Therefore, the burden of persuasion did not shift to Frito-Lay under *Leeper* and the odd lot doctrine. With that, the record summarized above contains evidence from which a jury could reasonably reach a verdict for the employer, and the trial court properly denied Foster's motion for a directed verdict.

### III. PARTIAL DIRECTED VERDICT – PALLET JACK ORDER FILLER

Foster argues that the superior court erred in failing to grant his motion for a partial directed verdict and in allowing the jury to consider the position of pallet jack order filler. In support, Foster cites to Martin's testimony that "pallet jack operation [is] not something that's commonly found in the labor market where that's all that individual is doing." CABR (Transcripts) at 29. According to Martin, pallet jack operation usually occurs in tandem with a driving position where the employee distributes products to stores.

Taking this evidence in the light most favorable to the nonmoving party, Martin's testimony shows that a pallet jack order filler position exists, but that it commonly requires an individual to be able to drive a vehicle. Frito-Lay does not appear to argue that this position does not typically require driving.

Foster argues that the record lacks evidence showing that he could drive a non-commercial vehicle, which often would be required of a pallet jack order filler. We disagree.

17

On one hand, Martin, among others, testified that Foster's vision defects would make it difficult to carry out driving needed for any job. However, Frito-Lay presented evidence that Foster had an unrestricted driver's license and that he did not have trouble driving in the video surveillance footage. Foster also contends that Martin's statement that it was "possible" for him to be a pallet jack order filler was not enough to submit the matter to the jury because "'possible' does not meet our standard of proof requiring opinions based upon probability." Br. of Appellant at 25. However, Baer testified that Foster could be a pallet jack order filler. Thus, regardless of Martin's opinion, Baer's testimony supplied substantial evidence to show that Foster could perform the duties of a pallet jack order filler.

For these reasons, this record does supply substantial evidence or reasonable inferences from that evidence to sustain a verdict for the nonmoving party, Frito Lay. *Chaney*, 176 Wn.2d at 732. Thus, the trial court properly denied Foster's motion for a partial directed verdict.[14]

## IV. ATTORNEY FEES

Foster also requests reasonable attorney fees and costs pursuant to RCW 51.52.130. RCW 51.52.130(1) provides:

> If, on appeal to the superior or appellate court from the decision and order of the board, said decision and order is reversed or modified and additional relief is granted to a worker or beneficiary, or in cases where a party other than the worker or beneficiary is the appealing party and the worker's or beneficiary's right to relief is sustained, a reasonable fee for the services of the worker's or beneficiary's attorney shall be fixed by the court. . .

---

[14] Foster further contends that no doctor was allowed to comment upon his ability to drive a non-commercial vehicle, and even if he could drive his own vehicle, this does not support an inference that he could drive a company vehicle. However, the evidence showed that he had an unrestricted license and was able to drive to some extent. Thus, a juror could have inferred that Foster could drive well enough to be a pallet jack order filler.

No. 49475-2-II

Because Foster does not prevail, we do not award attorney fees and costs under RCW 51.52.130.

CONCLUSION

We affirm the superior court and deny Foster's request for attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Bjorgen, C.J.
BJORGEN, C.J.

We concur:

Melnick, J.
MELNICK, J.

Sutton, J.
SUTTON, J.

19