[No. 14621-9-III.    Division Three.    April 2, 1996.]

PAULINE YOUNG, *Respondent*, v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Defendant*, SISTERS OF
CHARITY OF PROVIDENCE, *Appellant*.

*Schuyler T. Wallace, Jr., Edward S. McGlone III*, and *Wallace & Klor*, for appellant.

*Patrick K. Stiley, Derek W. Madel*, and *Pat Stiley & Associates, P.S.*, for respondent.

SCHULTHEIS, J. — After reviewing a Board of Industrial Insurance Appeals decision affirming a Department of Labor and Industries (L&I) order, the Spokane County Superior Court reversed Pauline Young's award of permanent partial disability. The court ordered Ms. Young's employer, Sisters of Charity of Providence, to pay Ms. Young pension benefits for permanent total disability. Sisters appeals, contending: (1) the court erred in applying the attending physician rule, (2) certain of the court's findings are unsupported by substantial evidence, and (3) the findings do not support the court's conclusion that Ms. Young was totally and permanently disabled as a result of her industrial injury. We affirm.

Ms. Young cleaned patient rooms in a nursing home run by Sisters, a self-insured employer. In February 1986, she slipped on ice while working and fell, injuring her knees. After about a month off work, Ms. Young returned to her nursing home duties but continued to complain of pain and swelling, especially in her left knee. The doctors she consulted diagnosed cartilage and ligament damage. They prescribed pain medication, recommended cessation of physical work and referred her to physical therapy.

Ms. Young's first L&I claim was closed in July 1987 with an award for permanent partial disability equal to five percent of the amputation value of the left leg at or above the knee joint with functional stump. She continued to work at Sisters until March 1988, when she applied to reopen her claim. Since that time, she has not returned to any kind of employment.

From June 1988 until April 1990, Ms. Young was treated by Dr. William Loomis, an osteopathic physician. He noted that Ms. Young began reporting left hip pain at

least by 1988, while she was seeing an orthopedic surgeon and a physical therapist. In the course of Dr. Loomis's treatment, he came to believe the hip pain was caused either by the original "jamming" of the leg bone into the hip joint, or by postural changes compensating for the knee injury. He eventually discarded the first theory and decided the hip pain was caused by the postural changes. On a more-probable-than-not basis, he determined the knee injury was a contributing factor in Ms. Young's hip pain.

"Physical capacities" tests run on Ms. Young during Dr. Loomis's treatment indicated that she could sit for only one-half hour at a time, for a total of three hours in an eight-hour day; stand for 15 minutes, for a total of one hour a day; and walk for 15 minutes, for a total of one-half hour a day. Additionally, she could lift five pounds "frequently" during an eight-hour day, and 10 pounds no more than four times a day. She could not squat, crawl, climb ladders or stairs, and she could only bend or kneel occasionally. Her only unobstructed movements were fine manipulation, such as that used with hand controls. Dr. Loomis believed this condition was fixed and permanent by the time Ms. Young moved to New Jersey in 1990. Because he was not a "vocational expert," Dr. Loomis declined at trial to give an opinion on Ms. Young's employability, but he stated that if she could find work to fit her limitations—including the "very real factor" that she may be able to work four hours one day and only one or two hours the next day—he would have no objection.

After Ms. Young reopened her claim in 1988, L&I sent her to three orthopedic surgeons for diagnosis: Dr. James Dunlap in November 1988 (as part of a panel examination), Dr. Bruce Powell in April 1989, and Dr. Donald Smith in March 1990. These doctors diagnosed bursitis (inflammation of the bursa sac around the joint) and spurring of the hip joint, all unrelated to the knee injury. Dr.

Smith did agree with Dr. Loomis that the postural change might have been one reason for the hip pain.[1]

Ms. Young's second claim was closed on September 10, 1990, with time loss to January 10, 1989. She was awarded permanent partial disability equal to 10 percent of the amputation value of the left leg, less the five percent already paid. Her appeal to the Board was unsuccessful. She then filed a notice of appeal in the superior court. On April 14, 1994, in a bench trial, the court reviewed the record and found that Ms. Young's hip pain was directly and proximately caused by the knee injury. Based on its finding that she had not been capable of reasonably continuous gainful employment since January 10, 1989, the court concluded she was totally and permanently disabled as a direct result of her industrial injury. The court reversed the order of the Board, remanded to L&I for reversal of the September 10, 1990 order, and ordered Sisters to pay Ms. Young pension benefits, including back benefits from January 10, 1989 on. Sisters' appeal followed.

Sisters first contends the trial court incorrectly applied the standard of review of Board decisions. It asserts the findings and conclusions of the Board were not proven incorrect by a "fair preponderance of the evidence." *Allison v. Department of Labor & Indus.*, 66 Wn.2d 263, 268, 401 P.2d 982 (1965). Specifically, it contends the trial court misapplied the attending physician rule by binding itself to Dr. Loomis's diagnosis.

■■ The Board's findings and conclusions are prima facie correct and the burden of proof is on the party attacking them. RCW 51.52.115; *Ravsten v. Department of*

---

[1]Dr. Smith was asked on redirect whether he agreed with Dr. Loomis that postural changes due to the knee injury were responsible for causing the bursitis. He answered as follows:

My answer to that would have to be that that could be one factor. However, this woman's weight problem, the fact that she is 56 years of age, and so forth, and that trochanteric bursitis is a very, very common problem for people in this age group, that would make me feel that was more probably than not due to her industrial injury.

*Labor & Indus.*, 108 Wn.2d 143, 146, 736 P.2d 265 (1987). The superior court is not bound by the Board's findings, however, unless the court " 'finds itself unable to make a determination on the facts because the evidence is evenly balanced . . . .' " *Layrite Prods. Co. v. Degenstein*, 74 Wn. App. 881, 887, 880 P.2d 535 (quoting *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 43, 395 P.2d 633 (1964)), *review denied*, 125 Wn.2d 1011 (1994). Appellate review is limited to examination of the record to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the court's conclusions of law flow from the findings. *Groff*, 65 Wn.2d at 41; *Layrite*, 74 Wn. App. at 887; *Oien v. Department of Labor & Indus.*, 74 Wn. App. 566, 568, 874 P.2d 876 (1994), *review denied*, 125 Wn.2d 1021 (1995).

Here, the superior court gave special weight to Dr. Loomis's opinion, discounted the diagnoses of the orthopedic surgeons hired by L&I, reversed the findings of the Board judge and found a direct causal relationship between the industrial accident and the hip bursitis. Sisters asserts the trial court mistakenly believed it was bound to take special consideration of Dr. Loomis's opinion.

*Spalding v. Department of Labor & Indus.*, 29 Wn.2d 115, 128-29, 186 P.2d 76 (1947), first gave special consideration to the attending or treating physician's testimony in workers' compensation cases. Recognizing that a hard and fast rule was not desirable, the court nevertheless found

> that an attending physician, assuming of course that he shows himself to be qualified, who has attended a patient for a considerable period of time for the purpose of treatment, . . . is better qualified to give an opinion as to the patient's disability than a doctor who has seen and examined the patient once.

*Spalding*, 29 Wn.2d at 128-29, *quoted in Judd v. Department of Labor & Indus.*, 63 Wn. App. 471, 474-75, 820 P.2d 62 (1991). It is now well settled that in workers' compensa-

tion cases, the court must give special consideration to the attending physician's opinion. *Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 654, 833 P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993). This consideration is reasonable in light of the fact that an attending physician is not "an expert hired to give a particular opinion consistent with one party's view of the case." *Intalco*, 66 Wn. App. at 654.

■ We also note that the industrial insurance act, being remedial in nature, must be liberally applied to achieve its purpose: compensation to all covered persons injured in their employment. *Hamilton*, 111 Wn.2d at 572; *Sacred Heart Medical Ctr. v. Carrado*, 92 Wn.2d 631, 635, 600 P.2d 1015 (1979); RCW 51.04.010. Special consideration of the attending physician's testimony supports this purpose and ensures protection of workers. *Hamilton*, 111 Wn.2d at 572-73.

Dr. Loomis may not be an orthopedic surgeon, but he is a family practitioner with a specialty in osteopathic medicine, he was on the board of the American Association of Orthopedic Medicine, and he has had extensive experience and training in the field. During cross-examination of Sisters' witnesses, Ms. Young's counsel established that two of Sisters' three medical experts regularly conducted examinations for L&I, self-insured employers and insurance companies. Only Dr. Smith appeared to testify regularly for claimants as well as employers, and Dr. Smith testified on redirect examination that postural changes "could be one factor" causing Ms. Young's bursitis.[2] While there is sufficient evidence to support either the Board's findings or the superior court's findings, the special consideration afforded to Dr. Loomis's testimony weighs in Ms. Young's favor.

Sisters next contends the trial court erred in concluding

---

[2]"The industrial injury need not be the sole proximate cause of disability." *Grimes v. Lakeside Indus.*, 78 Wn. App. 554, 561, 897 P.2d 431 (1995); *Wendt v. Department of Labor & Indus.*, 18 Wn. App. 674, 684, 571 P.2d 229 (1977).

that Ms. Young was totally and permanently disabled. Without testimony by a vocational expert showing Ms. Young's employability in the competitive labor market, Sisters argues, the findings do not show she was incapable of continuous gainful employment.

■ RCW 51.08.160 defines permanent total disability as "loss of both legs, or arms, or one leg and one arm, total loss of eyesight, paralysis or other condition permanently incapacitating the worker from performing any work at any gainful occupation." Recognizing early on that this provision was ambiguous, courts have supplemented its meaning with case law. *Leeper v. Department of Labor & Indus.*, 123 Wn.2d 803, 810, 872 P.2d 507 (1994). Generally, permanent total disability does not mean the worker must be absolutely helpless or without any occupational capacity. *Leeper*, 123 Wn.2d at 810-11; *Kuhnle v. Department of Labor & Indus.*, 12 Wn.2d 191, 197, 120 P.2d 1003 (1942). As stated in *Kuhnle*, 12 Wn.2d at 197 (quoting *Green v. Schmahl*, 202 Minn. 254, 256, 278 N.W. 157 (1938)), "sporadic competence, occasional, intermittent, and much limited capacity to earn something somehow, does not reduce what is otherwise total to a partial disability." The court must make a "practical and reasonable interpretation" of the claimant's ability to obtain work. *Leeper*, 123 Wn.2d at 812 (quoting *Kuhnle*, 12 Wn.2d at 198).

The definition of permanent total disability supplied by case law involves both a medical aspect—the physical impairment itself, and an employability aspect—the impairment's effect on wage earning capacity. *Adams v. Department of Labor & Indus.*, 128 Wn.2d 224, 230, 905 P.2d 1220 (1995). "The extent of physical impairment relates to ability to perform while the effect on wage-earning capacity relates to ability to obtain employment." *Adams*, 128 Wn.2d at 230. The evidence is examined to determine the individual's weaknesses, strengths, age, education, training, experience and loss of function, and the effect of these factors on qualifying the individual for employment

generally available in the labor market. *Fochtman v. Department of Labor & Indus.*, 7 Wn. App. 286, 295, 499 P.2d 255 (1972), *cited in Leeper*, 123 Wn.2d at 813.

 ▌ Also involved in the definition of total disability are the dual concepts of "general" and "special" work. *Graham v. Weyerhaeuser Co.*, 71 Wn. App. 55, 61, 856 P.2d 717 (1993), *overruled on other grounds in Leeper*, 123 Wn.2d at 817-18. General work means even light or sedentary work, if it is reasonably continuous, within the range of the claimant's capabilities, training and experience, and generally available on the competitive labor market. *Graham*, 71 Wn. App. at 60-61 (citing *Spring v. Department of Labor & Indus.*, 96 Wn.2d 914, 918-20, 640 P.2d 1 (1982); *Kuhnle*, 12 Wn.2d at 197; *Allen v. Department of Labor & Indus.*, 30 Wn. App. 693, 698, 638 P.2d 104 (1981)). A worker who cannot perform general work is totally disabled. *Spring*, 96 Wn.2d at 919. Once a claimant has carried the burden of proving he or she cannot perform general work, the "odd lot" doctrine shifts the burden to the employer to prove that the claimant can obtain and perform special work (work not generally available on the competitive labor market). *Spring*, 96 Wn.2d at 918-20; *Graham*, 71 Wn. App. at 62. A worker who can perform special work will not be considered totally disabled. *Spring*, 96 Wn.2d at 919; *Kuhnle*, 12 Wn.2d at 197-200.

In the case before us, the medical testimony of Dr. Loomis and the physical therapist who ran the physical capacities tests sufficiently established that Ms. Young was capable of performing only a limited range of activities. This and her lack of a high school education (although she did attain a GED), her age (mid-50s) and her limited experience in the labor force[3] substantially support the court's finding that Ms. Young was not capable of obtaining and performing reasonably continuous gainful employment. Sisters offered no evidence to show there was special work tailored to Ms. Young's disabilities in the local labor market.

---

[3]The record shows Ms. Young held jobs as a waitress, a telephone solicitor and a maintenance worker before working at Sisters.

■ Sisters insists that just as medical testimony is necessary to establish the physical impairment, the testimony of a vocational consultant is required to prove the availability and obtainability of jobs. While vocational testimony is relevant and admissible to show the labor market, a court need not consider expert testimony to determine total and permanent disability. *See Leeper*, 123 Wn.2d at 813 (relevance). We agree with the trial court that the testimony of a vocational expert was unnecessary here because common sense, supported by the evidence, showed that Ms. Young's limited employment skills and her physical inability to stand or sit for any consistent length of time prevented her from finding or retaining reasonably continuous gainful employment.

In sum, there is sufficient evidence to support the court's finding that Ms. Young is totally and permanently disabled because she cannot perform work of a general nature. *Spring*, 96 Wn.2d at 919. Sisters did not present evidence that special work existed for Ms. Young in the local labor market, and thereby failed to disprove total disability via the odd lot doctrine. *Leeper*, 123 Wn.2d at 815.

■ Ms. Young requests attorney fees for defending this appeal. The award of attorney fees in a workers' compensation case is controlled by RCW 51.52.130. *Flanigan v. Department of Labor & Indus.*, 123 Wn.2d 418, 427, 869 P.2d 14 (1994); *Carnation Co. v. Hill*, 115 Wn.2d 184, 187, 796 P.2d 416 (1990). Attorney fees are awarded to the worker whose appeal to the superior or appellate court results in a reversal or modification of the Board decision, as well as to the worker whose right to relief is sustained when the department or employer appeals.[4] RCW

[4]Prior to 1993, RCW 51.52.130 was construed to authorize attorney fees only for appeals to the superior court resulting in reversal or modification of the Board decision and an increase in the relief granted. *Flanigan*, 123 Wn.2d at 427; *Carnation*, 115 Wn.2d at 187-88. The statute was amended by Laws of 1993, ch. 122, § 1, to include appellate court appeals and affirmance of Board decisions appealed by the department or employer. The right to attorney fees is governed by the statute in force at the termination of the action. *Kilpatrick v. Department of Labor & Indus.*, 125 Wn.2d 222, 883 P.2d 1370 (1994), *as amended by* Order Changing Opinion Jan. 27, 1995; *Petersen v. Port of Seattle*, 94 Wn.2d 479, 487, 618 P.2d 67 (1980).

51.52.130. Accordingly, upon Ms. Young's compliance with RAP 18.1, our commissioner shall fix a reasonable fee for services before this court. RAP 18.1(f).

Affirmed.

SWEENEY, C.J., and THOMPSON, J., concur.

Reconsideration granted and opinion modified May 8, 1996.

Review denied at 130 Wn.2d 1009 (1996).