# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

TAMRA J. CREIGHTON,

Appellant,

v.

UNITED AIRLINES, INC., AND
DEPARTMENT OF LABOR AND
INDUSTRIES,

Respondent.

No. 58293-7-II

UNPUBLISHED OPINION

LEE, J. — Tamra J. Creighton appeals the superior court's order confirming the decision by the Board of Industrial Insurance Appeals (Board) to close Creighton's workers' compensation claim under the Industrial Insurance Act (IIA), title 51 RCW, denying her further treatment, ending time loss benefits, and making a permanent partial disability award. Because substantial evidence supports the superior court's findings, and those findings support the superior court's conclusion that Creighton was at maximum medical improvement and was only partially, not totally, disabled, we affirm the superior court's order.

## FACTS

### A. BACKGROUND OF INJURY CLAIM

In February 2001, Creighton suffered an industrial injury while working for United Airlines (United). As she loaded heavy bags onto a cart, Creighton fell, hurting her back, chest, and neck.

Creighton subsequently filed a workers' compensation claim, which the Department of Labor and Industries (Department) accepted. Creighton had two surgeries under her covered

claim: a 2003 cervical fusion[1] at C5, C6, and C7; and a 2016 laminectomy and decompression[2] surgery at L3, L4, and L5.[3] The cervical fusion addressed Creighton's cervical degenerative disc disease, while the laminectomy and decompression surgery addressed Creighton's spinal canal stenosis and degenerative changes in her lumbar spine.

Creighton considered additional treatment following the 2016 surgery. In a 2017 clinic note, Creighton's then doctor wrote, "Surgery can be considered. However, this would likely entail not just the [L]3-4 and [L]4-5 fusion, but most likely a fusion from L2 to down to L5, potentially even to the sacrum, clearly a major procedure." Clerk's Papers (CP) at 314. In a 2018 clinic note, the same doctor noted that while "[s]urgery is not unreasonable," he was "very skeptical about the chances of significant functional improvement with further surgery." CP at 311.

On March 19, 2019, the Department closed Creighton's claim, finding her covered conditions were stable. Wanting additional treatment, Creighton appealed the March 2019 order,

---

[1] A cervical or spinal fusion is a "'welding'" process used to correct problems with the small bones in the spine (vertebrae). Clerk's Papers (CP) at 147. The procedure fuses together two or more vertebrae into a single, solid bone to eliminate painful movement and restore spinal stability.

[2] A decompression (laminectomy) procedure involves alleviating pressure on the spinal nerves by removing the bone and diseased tissues.

[3] The human spine is made up of 33 vertebrae stacked on top of one another, and can be grouped into five segments. *Spine Structure and Function*, Cleveland Clinic (Oct. 18, 2023), https://my.clevelandclinic.org/health/body/10040-spine-structure-and-function. The top of the spine is the cervical spine (neck) and is made up of seven vertebrae, C1-C7. *Spine Structure and Function.* The middle back, or thoracic spine, is made up of 12 vertebrae, T1-T12. *Spine Structure and Function.* The lower back, or lumbar spine, is made up of five vertebrae, L1 to L5. *Spine Structure and Function.* The sacrum is below the lumbar spine and is made up of five sacral vertebrae, S1-S5. *Spine Structure and Function.* Finally, the coccyx, or tailbone, is a piece of bone at the bottom of the spine composed of four fused vertebrae. *Spine Structure and Function.*

No. 58293-7-II

and on July 10, 2019, the Department affirmed its March 2019 order closing Creighton's claim. Creighton then appealed the Department's July 2019 order to the Board, seeking a reopening of her claim, authorization for an additional fusion surgery to her lumbar spine, and time loss benefits.

B.  BOARD OF INDUSTRIAL INSURANCE APPEALS

At a hearing before the Industrial Appeals Judge (IAJ), several witnesses testified by deposition and Creighton herself testified live. Testimony relevant to this appeal is included below.

1.  Medical Testimony

a.  Dr. Bransford's testimony

Dr. Richard Bransford is an orthopedic surgeon with training in adult spinal surgery. Dr. Bransford saw Creighton in November 2020. Creighton reported that she had scoliosis[4] and complained of "significant bilateral lower pain and neuropathy, particularly aggravated from lying down to sitting, sitting to standing." CP at 948.

Dr. Bransford reviewed some of Creighton's imaging studies from 2016, 2018, and 2020. Dr. Bransford explained those studies showed Creighton had "a 20 degree right-sided scoliosis

---

[4] Dr. Bransford explained "scoliosis" as follows:

[W]hen we look at somebody from a front view, their vertebral bodies are supposed to be all stacked properly on top of one another. If they are not stacked up properly, well, that's when scoliosis develops and then you get these eccentric loads and it's like . . . kids stacking building blocks, they start to topple over and they can't keep their balance.

CP at 950.

3

measuring from L1 to L5," lateral listhesis and anterolisthesis[5] of L3 on L4, and significant disc collapse at L3-4 and L4-5. CP at 949. Dr. Bransford opined that Creighton had multilevel stenosis,[6] which was worst from L3-S1. Dr. Bransford explained that scoliosis "changes the alignment of the foramen or where the nerves are supposed to exit, and as that happens, then the nerves can get pinched through their exiting corridors and that can lead to leg pain and radiculopathy." CP at 950. Scoliosis can also "change the loading of the spine . . . and that can lead to degeneration through the disc" and "just sort of starts this whole cascade of things." CP at 950-51. Dr. Bransford could not say whether Creighton had scoliosis before her industrial injury.

Based on Creighton's subjective complaints and her imaging studies, Dr. Bransford opined that Creighton's back was not "fixed and stable" and recommended she undergo a T10-pelvis decompression fusion. CP at 980. The surgery would relieve some of the pressure on her compressed nerve roots, "correct her scoliosis," and stabilize her spine. CP at 966. In other words, such an extensive surgery "allows you to sort of try and do everything in one fell swoop." CP at 992 However, Dr. Bransford could not say, on a more probable than not basis, that Creighton's need for surgery was related to her industrial injury and the conditions accepted under her claim.

---

[5] "Listhesis" is the "translation" or movement of one vertebral body in relation to another. CP at 952. For example, "a lateral listhesis is looking at somebody from the front," and "in [Creighton's] case . . . L3 is sliding to the side on top of L4." CP at 952. Similarly, "anterolisthesis means that one vertebral body is moving anteriorly with respect to the other vertebral body, and [Creighton] has an anterolisthesis also looking at her from the side-view . . . of L3 on L4." CP at 952.

[6] "Stenosis" "means narrowing." CP at 962. Central stenosis occurs where a nerve's exit is "pinch[ed] centrally around the spinal cord or the nerve root centrally" while foraminal stenosis is "where the nerve is sort of exiting underneath the pedicle and underneath the joint." CP at 963.

b.      Dr. Holmes's testimony

Dr. Mark Holmes is a board certified neurologist who performed an independent medical examination (IME) of Creighton in February 2017.  During the examination, Creighton reported "pain in her lower back and right buttock area" and "in the left buttock . . . all the way . . . down her leg," with "numbness throughout her left lower extremity."  CP at 1184.

Dr. Holmes performed a neurological examination, looking for "clinical evidence to support [Creighton's] symptoms."  CP at 1186.  Dr. Holmes testified that he found no clinical evidence of a nerve root injury and no evidence that Creighton had any "sciatic pain or radiculopathy or any other limitations associated with her lumber spine from a neurological perspective."  CP at 1189.

Based on his examination, Dr. Holmes opined that as of 2017, Creighton was at maximum medical improvement and did not recommend further treatment.  Dr. Holmes testified that he reviewed a 2018 IME conducted by Dr. Robert Kalb and that as of May 2018, Creighton was still at maximum medical improvement and further treatment was still unnecessary.  Dr. Holmes also opined that Dr. Bransford's recommended fusion surgery was not related to Creighton's industrial injury and that, in the absence of clinical findings, the surgery was not justified.

c.      Dr. Kalb's testimony

Dr. Kalb is a board certified orthopedic surgeon who conducted an IME of Creighton in May 2018.  Based upon his examination, Dr. Kalb opined that Creighton was not in need of further treatment and that any additional treatment "could [not] be considered curative."  CP at 1349.

As for the fusion surgery recommended by Dr. Bransford, Dr. Kalb testified it was not medically proper or necessary.  Dr. Kalb explained that Creighton's 1999 imaging studies

5

indicated she had scoliosis before her industrial injury, and that her industrial injury did not cause the scoliosis. Nor did the 2016 surgery cause or aggravate Creighton's scoliosis. Dr. Kalb also explained that the 2016 surgery did not "affect the aging process or the long-term outcome of [Creighton's] spine." CP at 1362. And the listhesis at L3-4 did not itself justify Dr. Bransford's recommended surgery in the absence of objective evidence of a worsening of the listhesis. Thus, in light of the results of the 2016 surgery, Dr. Bransford's recommended surgery was particularly unlikely to produce positive results.

Dr. Kalb also testified that based on his review of the record, the two accepted conditions under Creighton's claim were degenerative disc disease at C5, C6, and C7, and degenerative disc disease of the lumbar spine at L3, L4, and L5. Dr. Kalb then testified it was "possible" that Dr. Bransford's recommended "fusion surgery would be *in part* to treat conditions that were already accepted on the claim." CP at 1732 (emphasis added). However, on redirect, Dr. Kalb explained that "multiple level degenerative disease of the lumbar spine" was actually a "contraindication . . . for a lumbar fusion." CP at 1747. Dr. Kalb explained that "the more levels you attempt to fuse the higher chance of . . . non union at one or more of those levels" and that such a surgery results in "a serious, solid segment of spine followed by the first mobile segment above and below, which then has a much higher right [sic] of deterioration." CP at 1747.

2.      Employability Testimony

John DeLapp, a vocational rehabilitation counselor, testified that as of July 10, 2019, Creighton was capable of working as a customer service representative. DeLapp also testified that he reviewed records from a prior vocational expert who found Creighton employable as of March 27, 2018, and concluded that the finding was still applicable.

DeLapp explained that when considering customer service representatives, soft skills, which are skills "that are not necessarily knowledge based," are particularly important. CP at 1469. The soft skills required of a customer service representative include effective communication, conflict resolution, investigation, phone etiquette, documentation, and problem-solving. DeLapp also explained that a customer service representative is expected to interact with customers, transmit information "about accounts, products, and services," "address customer concerns" and "mak[e] decisions relative to the industry or the type of business in which you're being involved." CP at 1466. DeLapp testified that Creighton, while working at Untied, would have used the soft skills employers look for in customer service representatives. And while Creighton used a specific software system while with United, customer service representative applicants could expect "some sort of training," including on particular computer software, "once they have satisfied those soft skills that employers look for." CP at 1470.

As for physical limitations, DeLapp classified the customer service representative position as a sedentary position, meaning lifting and carrying were limited to 10 pounds or less. DeLapp testified that the position would require constant sitting or a combination of sitting and standing on an occasional basis, occasional standing and walking, constant talking, occasional reaching out, rarely reaching up or down, and frequent keyboarding. DeLapp explained that many of these demands or activities could be modified to accommodate physical limitations: "Modifications in work sites," such as sit-stand stations, "are common these days." CP at 1468. Ultimately, DeLapp opined that Creighton could physically work as a customer service representative within her physical limitations.

Creighton herself confirmed that she had many of the soft skills employers look for, like listening, effective communication, information gathering, problem solving, and conflict resolution. In fact, Creighton testified that while she worried about her physical limitations and her patience, she thought she could work in a customer service job. Creighton also testified that she can alternate between sitting, standing, and walking, can drive, and can sit for up to an hour, as long as she changes positions occasionally.

Other witnesses also opined on Creighton's ability to work. For example, Dr. Kalb testified that Creighton was capable of obtaining and maintaining continuous and gainful employment so long as she avoided overhead work, more than occasional lifting and bending, and lifting more than 35 pounds generally or more than 15 pounds frequently. Christina Casady, an occupational and rehabilitation expert, acknowledged that Creighton could work as a customer service representative so long as she could work within the limitations her evaluations identified. For example, Creighton could alternate between sitting, walking, and standing for eight hours at a time. And while Creighton's own vocational expert, Merrill A. Cohen, worried about Creighton's postural limitations, Cohen also acknowledged that accommodations would allow Creighton to "meet . . . the physical demands of the job." CP at 893.

3.      Orders

The IAJ issued a proposed decision and order (proposed order) on September 16, 2021. The proposed order affirmed the Department's July 2019 order.

Creighton petitioned for review of the IAJ's proposed order. The Board affirmed the IAJ's proposed order and adopted it as the Board's final order.

C.      SUPERIOR COURT PROCEEDINGS

Following the Board's final order, Creighton appealed to the superior court. The superior court held a bench trial on January 17, 2023, and issued a written judgment and order affirming the Board's decision. The superior court also issued the following relevant written findings of fact and conclusions of law:

I.      Findings of Fact

. . . .

2. Tamra J. Creighton sustained an industrial injury on February 12, 2001, while working for United Airlines. Ms. Creighton was injured when she fell while loading a 70 pound bag onto a cart.

. . . .

4. The Court is not persuaded that the holding in *Maphet*[7] entitles Ms. Creighton to the sought-after surgery. The Court interprets *Maphet* in a narrower sense than Ms. Creighton. The Court is not persuaded by Dr. Bransford's sole opinion that the condition he identified and surgery he recommended are related to the industrial injury when that opinion is contradicted by other medical professionals and even qualified by Dr. Bransford himself. After a *de novo* review of the [Certified Appeal Board Record], the Court is persuaded that the most persuasive, credible medical testimony established that Ms. Creighton's condition was at maximum medical improvement.

5. As of July 10, 2019, Ms. Creighton's conditions proximately caused by the industrial injury were fixed and stable and did not need further proper and necessary treatment.

6. Ms. Creighton is 58 years of age. Ms. Creighton did not complete high school but obtained her GED. Ms. Creighton began working for United Airlines in 1986 and worked there for 21 years. Prior to working for United Airlines, she worked as a garments worker and an officer helper for a construction company.

7. Due to the February 12, 2001 industrial injury, Ms. Creighton has physical restrictions to include lifting, bending, and overhead activity.

---

7  *Clark County v. Maphet*, 10 Wn. App. 2d 420, 451 P.3d 713 (2019).

8. Due to the February 12, 2001 industrial injury, Ms. Creighton does not have any mental health restrictions.

9. Ms. Creighton is able to perform sedentary to light-duty positions.

10. The Court declines to apply the Odd Lot doctrine as Ms. Creighton has not proven that she cannot perform light or sedentary work of a general nature.

11. Ms. Creighton was able to perform and obtain gainful employment on a reasonably continuous basis from March 27, 2018, through July 10, 2019, and thereafter.

12. As of July 10, 2019, Ms. Creighton had a permanent partial disability proximately caused by the industrial injury equal to Category 3 for the cervicodorsal and Category 2 for the lumbosacral spine.

## II.    Conclusions of Law

. . . .

2. Ms. Creighton's conditions proximately caused by the industrial injury are fixed and stable as of the July 10, 2019 Department order and she is not entitled to further treatment.  RCW 51.36.010.

3. Ms. Creighton was not a temporarily totally disabled worker within the meaning of RCW 51.32.080 from March 27, 2018, through July 10, 2019.

4. On July 10, 2019, Ms. Creighton did have a permanent partial disability, within the meaning of RCW 51.32.080, proximately caused by the industrial injury.

5. Ms. Creighton was not a permanently totally disabled worker within the meaning of RCW 51.08.160 as of July 10, 2019.

6. The Department order dated July 10, 2019, is correct and is affirmed.

CP at 1982-83.

Creighton appeals the superior court's order.

10

No. 58293-7-II

ANALYSIS

A.    STANDARD OF REVIEW

Under the IIA, workers injured on the job are entitled to compensation for their injuries. RCW 51.32.010. In addition to compensation, an injured worker is entitled to "proper and necessary" care, including surgery, for the period of their disability. RCW 51.36.010(2)(a).

We review the superior court's order, not the Board's order,[8] to determine whether the superior court's findings of fact are supported by substantial evidence and whether the court's conclusions of law flow from those findings. *Birgen v. Dep't of Lab. & Indus.*, 186 Wn. App. 851, 856, 347 P.3d 503, *review denied*, 184 Wn.2d 1012 (2015); *Rogers v. Dep't of Lab. & Indus.*, 151 Wn. App. 174, 180, 210 P.3d 355, *review denied*, 167 Wn.2d 1015 (2009).

Substantial evidence supports a finding of fact when the evidence is sufficient to persuade a fair-minded, rational person of the truth of the matter. *Perez v. Dep't of Lab. & Indus.*, 28 Wn. App. 2d 916, 921, 542 P.3d 584 (2023), *review denied*, 2 Wn.3d 1033 (2024). In reviewing findings of fact for substantial evidence, the record is viewed in the light most favorable to the party that prevailed before the superior court. *Stone v. Dep't of Lab. & Indus.*, 172 Wn. App. 256, 260, 289 P.3d 720 (2012). We do not reweigh or rebalance competing testimony or inferences nor do we make or review credibility determinations. *Id.*; *Cantu v. Dep't of Lab. & Indus.*, 168 Wn.

---

[8] When the superior court confirms "the Board's decision . . . it is unnecessary for the superior court to make its own findings. The superior court can make its own findings or reach a different result only if the judge finds by a preponderance of the evidence that the Board's findings and decision are erroneous." *Harder Mech., Inc. v. Tierney*, 196 Wn. App. 384, 391, 384 P.3d 241 (2016). Here, the superior court confirmed the Board's decision was correct, but made its own findings of fact and conclusions of law. Thus, we review the superior court's findings of fact and conclusions of law.

11

App. 14, 22, 277 P.3d 685 (2012). Also, unchallenged factual findings are verities on appeal. *Stone*, 172 Wn. App. at 260.

Here, Creighton assigns error to Conclusions of Law 2, 3, 5, and 6 and Findings of Fact 4 and 10. Thus, all factual findings besides Findings 4 and 10 are verities on appeal and make up "the facts of the case." *Id.*; *Davis v. Dep't of Lab. & Indus.*, 94 Wn.2d 119, 123, 615 P.2d 1279 (1980). Accordingly, review is limited to whether substantial evidence supports Findings 4 and 10, and whether the challenged conclusions flow from the superior court's findings. *Rogers*, 151 Wn. App. at 180.

B.    ADDITIONAL TREATMENT

Creighton argues that she is entitled to further treatment under her worker's compensation claim and that the superior court erred by concluding otherwise. Specifically, Creighton assigns error to Finding of Fact 4 and Conclusion of Law 2, both of which touch on Creighton's eligibility for treatment under the IIA, and cites to Dr. Bransford's testimony in support of the challenge. United and the Department respond that the additional treatment Creighton seeks is not proper and necessary as required under the IIA. We agree with United and the Department.

1.    Finding of Fact 4

When a worker suffers an industrial injury, they are entitled to proper and necessary medical care while disabled by their injury. RCW 51.36.010(2)(a). Proper and necessary care is curative or rehabilitative. WAC 296-20-01002(Proper and necessary)(2)(b). But once the injured "worker reaches a state of maximum medical improvement," the injured worker is no longer entitled to treatment. WAC 296-20-01002(Proper and necessary)(3). "Maximum medical

improvement occurs when no fundamental or marked change in an accepted condition can be expected, with or without treatment." WAC 296-20-01002(Proper and necessary)(3).

After reviewing the record de novo, the superior court found in Finding of Fact 4 that the "credible medical testimony established that Ms. Creighton's condition was at maximum medical improvement." CP at 1982. The superior court was not persuaded "by Dr. Bransford's sole opinion that the condition he identified and surgery he recommended are related to the industrial injury when that opinion is contradicted by other medical professionals and even qualified by Dr. Bransford himself." CP at 1982. The superior court also found that based on "the most persuasive, credible medical testimony" in the record—which did not include Dr. Bransford's opinion—"Ms. Creighton's condition was at maximum medical improvement." CP at 1982. As stated above, in determining whether substantial evidence supports a finding of fact, we "do not reweigh or rebalance the competing testimony," nor do we disturb credibility determinations made by the trier of fact. *Stone*, 172 Wn. App. at 260; *Cantu*, 168 Wn. App. at 22.

Here, the evidence shows that the additional treatment was not related to Creighton's industrial injury and that Creighton was at maximum medical improvement. For example, Dr. Holmes testified that, in the absence of sufficient clinical findings supporting Creighton's complaints, the surgery she sought was not justified. Dr. Holmes also testified that the surgery was unrelated to Creighton's industrial injury—the degenerative disease in Creighton's spine "is preexisting and would have occurred whether or not she was working." CP at 1212. Ultimately, Dr. Holmes opined that Creighton was at maximum medical improvement as of her 2017 IME.

Dr. Kalb also testified that the additional treatment was unrelated to Creighton's injury and that further treatment was not proper and necessary. While Dr. Bransford testified that his

recommended surgery would correct Creighton's scoliosis, Dr. Kalb testified that Creighton's scoliosis predated her industrial injury and was not caused by that injury. Dr. Kalb further testified that in light of the results of the 2016 failed surgery, additional treatment was particularly unlikely to produce positive results. Instead, the "multiple level degenerative disease of the lumbar spine," like Creighton had, was actually a "contraindication . . . for a lumbar fusion." CP at 1747.

Ultimately, even Dr. Bransford could not fully relate his recommended surgery to Creighton's industrial injury: when asked whether he could testify, on a medically more probable than not basis, that Creighton's "need for surgery is related to that original industrial injury and the accepted conditions on her claim," Dr. Bransford testified that he could not. CP at 977. Instead, Dr. Bransford stated such a connection was "just probable," and stressed how difficult it was to determine how much of Creighton's alleged need for surgery was due to her industrial injury and how much was due to the natural progression of her spine. CP at 978. While Dr. Bransford did opine that as of the closure of Creighton's claim, her condition was not fixed and stable, he also admitted that he "did not read all of [the records]" in this case and could not "recall all of them in detail." CP at 974.

Creighton seeks to have this court reverse the superior court by rejecting the superior court's credibility determinations, reweigh the evidence, and rely on Dr. Bransford's testimony, which the superior court found not credible. We cannot usurp the trier of fact's credibility determinations and reweigh the evidence. *Stone*, 172 Wn. App. at 260; *Cantu*, 168 Wn. App. at

14

22. Accordingly, we hold that the superior court did not err in finding that Creighton's condition was at maximum medical improvement and that Creighton was not entitled to further treatment.[9]

    2.    *Maphet*

Creighton argues that the superior court misapplied *Maphet* and that *Maphet* supports finding "United Airlines accepted and is responsible for the lumbar strain and permanent aggravation of Creighton's pre-existing lumbar degenerative disease." Br. of Appellant at 26. We disagree.

In *Maphet*, the worker injured her knee at work, and her self-insured employer authorized several surgeries to address the injury. 10 Wn. App. 2d at 424. As a result of the fifth authorized surgery, the worker developed a patellofemoral instability. *Id.* The Department authorized a sixth, seventh, and eighth surgery to address the patellofemoral instability, but then refused to authorize a ninth surgery also intended to treat the patellofemoral instability. *Id.*

On appeal, we explained that "[i]f the self-insured employer authorizes a surgery, the self-insured employer has accepted the condition" the surgery was intended to treat. *Id.* at 435. We further explained that, "when the [employer] authorized the sixth, seventh, and eighth surgeries to treat patellofemoral instability, it 'accepted' the condition and therefore was responsible for the ninth surgery, which addressed the same condition." *Id.* We did not address whether the ninth surgery was proper and necessary medical treatment because the employer had already conceded it was. *Id.* at 423.

---

[9] Moreover, the superior court, in Finding of Fact 5, found that Creighton's conditions that were "proximately caused by the industrial injury were fixed and stable and did not need further proper and necessary treatment." CP at 1982. Creighton does not assign error to Finding of Fact 5; therefore, this finding is a verity on appeal. *Davis*, 94 Wn.2d at 123.

Here, the superior court referenced *Maphet* in Finding of Fact 4, stating it was "not persuaded that the holding in *Maphet* entitles Ms. Creighton to the sought-after surgery" because it "interprets *Maphet* in a narrower sense than Ms. Creighton." CP at 1982. Even assuming without deciding that the superior court erred in its interpretation of *Maphet*, any such error is harmless because *Maphet* is distinguishable from and inapplicable to Creighton's case.

First, there is no evidence that the additional treatment sought was to address a condition that resulted from a previously authorized treatment. In fact, to the extent Dr. Bransford traced Creighton's need for surgery to a particular happening, he traced it to her industrial injury, not her 2016 surgery.

Second, the superior court found in Finding of Fact 5 that "[a]s of July 10, 2019, Ms. Creighton's conditions proximately caused by the industrial injury were fixed and stable and did not need further proper and necessary treatment." CP at 1982. Creighton does not assign error to Finding of Fact 5; therefore, this finding is a verity on appeal. *Stone*, 172 Wn. App. at 260. Thus, *Maphet* is inapplicable because the additional treatment Creighton seeks is *not* proximately caused by the industrial injury, and because Creighton's conditions were fixed and stable, no further treatment was proper and necessary.

Unlike the worker in *Maphet*, Creighton fails to show that the additional treatment was to treat a condition that resulted from previous treatments that were authorized by United. And Finding of Fact 5 establishes that the additional treatment was not proper and necessary to treat conditions related the industrial injury because Creighton's conditions were fixed and stable, while Finding of Fact 4 establishes that Creighton had reached maximum medical improvement.

3.      Conclusion of Law 2

The superior court's Conclusion of Law 2 states that "as of . . . July 10, 2019 . . . [Creighton] is not entitled to further treatment" because her conditions were "fixed and stable," and that conclusion flows from the superior court's findings. CP at 1983. In Finding of Fact 4, the superior court found that Creighton was at maximum medical improvement. "'Maximum medical improvement' is equivalent to 'fixed and stable.'" WAC 296-20-01002(Proper and necessary)(3). Also, in Finding of Fact 5, the superior court found that Creighton's conditions proximately caused by the industrial injury were fixed and stable, and Creighton did not need further proper and necessary treatment. Thus, Conclusion of Law 2 is supported by the superior court's findings.

Accordingly, the trial court did not err in Finding of Fact 4 or Conclusion of Law 2.[10]

C.      DISABILITY FINDINGS CONCLUSIONS

Creighton argues that the superior court erred (1) when it failed to correctly apply the Odd Lot Doctrine; (2) in Conclusion of Law 3, which stated, "Ms. Creighton was not a temporarily totally disabled worker within the meaning of RCW 51.32.080 from March 27, 2018, through July 10, 2019"; (3) in Conclusion of Law 5, which stated, "Ms. Creighton was not a permanently totally disabled worker within the meaning of RCW 51.08.160 as of July 10, 2019"; and (4) in Conclusion

---

[10] Creighton also argues that, under the compensable consequences doctrine, she is entitled to further treatment because her previous surgery worsened her injury. However, Creighton did not raise this argument before the Board, or in the superior court, and may not do so for the first time on appeal.

RCW 51.52.104 requires that any petition for review to the Board "shall set forth in detail the grounds therefor and the party or parties filing the same shall be deemed to have waived all objections or irregularities not specifically set forth therein." Therefore, because Creighton did not raise the compensable consequences doctrine in her petition to the Board, it is deemed waived.

of Law 6, which stated, "The Department order dated July 10, 2019, is correct and is affirmed." CP at 1983. We disagree.

1.      Legal Principles

If an injury renders a worker temporarily totally disabled, the worker receives "time loss" benefits to replace the wages the worker forgoes as a result of their injury. WAC 296-20-01002(Total temporary disability); *Hubbard v. Dep't of Lab. & Indus.*, 140 Wn.2d 35, 43, 992 P.2d 1002 (2000). A worker is temporarily totally disabled if the condition caused by their industrial injury "temporarily incapacitates [the] worker from performing any work at any gainful employment." *Hubbard*, 140 Wn.2d at 43. Thus, a worker's ability "to earn a wage at any kind of reasonably continuous and generally available employment" ends any temporary disability benefits. *Id.* Once a worker reaches maximum medical improvement, their temporarily disability claim is closed and the Department determines what, if any, permanent disability award the worker is entitled to. *See Pybus Steel Co. v. Dep't of Lab. & Indus.*, 12 Wn. App. 436, 438, 530 P.2d 350 (1975) ("The condition of an injured workman must be fixed before a rating of permanent . . . disability can be given."); WAC 296-20-01002(Proper and necessary)(3) ("'Maximum medical improvement' is equivalent to 'fixed and stable.'").

"'Permanent total disability' means loss of both legs, or arms, or one leg and one arm, total loss of eyesight, paralysis or other condition permanently incapacitating the worker from performing any work at any gainful occupation." RCW 51.08.160. The concept of total disability is "a combination of medical and vocational factors, 'the medical *fact* of loss of function and disability, together with the inability to perform and the inability to obtain work as a result of . . . industrial injury." *Leeper v. Dep't of Lab. & Indus.*, 123 Wn.2d 803, 817, 872 P.2d 507 (1994)

(emphasis in original) (alteration in original) (quoting *Focthman v. Dep't of Lab. & Indus.*, 7 Wn. App. 286, 294, 499 P.2d 255 (1972)). Our supreme court has set out a whole person approach to determining total disability, whereby the trier of fact must consider the worker's "weaknesses and strengths, age, education, training and experience, reaction to the injury, loss of function, and other factors relevant to whether the worker is, as a result of the injury, disqualified from employment generally available in the labor market." *Id.* at 814-15. The only difference between temporary and permanent disability is "the duration of disability, and not in its character." *Hubbard*, 140 Wn.2d at 43; *see also Bonko v. Dep't of Lab. & Indus.*, 2 Wn. App. 22, 25, 466 P.2d 526 (1970).

Under the "odd lot doctrine," "a claimant must prove he or she is incapable of performing light or sedentary work of a *general* nature." *Leeper*, 123 Wn.2d at 815 (emphasis in original). "General work" means "even light or sedentary work, if it is reasonably continuous, within the range of the claimant's capabilities, training and experience, and generally available on the competitive labor market." *Young v. Dep't of Lab. and Indus.*, 81 Wn. App. 123, 131, 913 P.2d 402, *review denied*, 130 Wn.2d 1009 (1996). A worker makes a prima facie case of total disability if they establish they were

> able to work prior to injury and [are] unable to do so after injury because of pain and the nature of the injury; when medical experts have testified to the loss of function and limitations on [the worker's] ability to work; and when vocational experts have concluded that the workman is not employable in the competitive labor market.

*Spring v. Dep't of Lab. & Indus.*, 96 Wn.2d 914, 918, 640 P.2d 1 (1982). If the claimant proves they are incapable of performing general light or sedentary work, "the burden of proof shifts to the Department, and it must show odd jobs or special work exist in the local labor market that the claimant could obtain." *Leeper*, 123 Wn.2d at 815.

19

2.     The Odd Lot Doctrine is Not Applicable

Creighton argues that the superior court incorrectly applied the Odd Lot Doctrine. Here, the superior court found in Finding of Fact 9 that "Ms. Creighton is able to perform sedentary to light-duty positions." CP at 1983. And in Finding of Fact 10, the superior court declined to apply the Odd Lot Doctrine because "Creighton has not proven that she cannot perform light or sedentary work of a general nature." CP 1983. Creighton did not assign error to Finding of Fact 9; therefore, it is a verity on appeal. *Stone*, 172 Wn. App. at 260. Creighton also did not explicitly assign error to Finding of Fact 10, arguing instead that the superior court misapplied the Odd Lot Doctrine.

Even if Creighton's argument can be construed as challenging Finding of Fact 10, Creighton's assertion that the superior court incorrectly applied the Odd Lot Doctrine fails because substantial evidence supports the superior court's finding that Creighton was able to perform sedentary to light-duty work of a general nature. For example, DeLapp, a vocational rehabilitation counselor, testified that as of July 10, 2019, Creighton was capable of working as a customer service representative. DeLapp also testified that he reviewed records from a prior vocational expert who found Creighton employable as of March 27, 2018, and concluded that the finding was still applicable.

DeLapp explained that when considering customer service representatives, soft skills "that are not necessarily knowledge based" were particularly important. CP at 1469. The soft skills required of a customer service representative included   effective communication, conflict resolution, investigation, phone etiquette, documentation, and problem-solving.   DeLapp explained that a customer service representative would be expected to interact with customers, transmit information "about accounts, products, and services," "address customer concerns," and

"mak[e] decisions relative to the industry or the type of business in which you're being involved." CP at 1466. DeLapp testified that the soft skills Creighton would have used at United were consistent with the soft skills employers are looking for in customer service representatives. And while Creighton used a specific software system while with United, DeLapp testified that customer service representative applicants could expect "some sort of training," including on particular computer software, "once they have satisfied those soft skills that employers look for." CP at 1470.

Creighton herself confirmed that she had many of the soft skills employers would look for, like listening, effective communication, information gathering, problem solving, delegation, and conflict resolution. In fact, Creighton testified that while she worried about her physical limitations and her patience, she thought she could work in a customer service job.

As for her physical limitations, DeLapp classified the customer service representative position as a sedentary position, meaning lifting and carrying were limited to 10 pounds or less. DeLapp testified that the position would require constant sitting or a combination of sitting and standing on an occasional basis, occasional standing and walking, constant talking, occasional reaching out, rarely reaching up or down, and frequent keyboarding. DeLapp explained that many of these demands or activities could be modified to accommodate physical limitations: "Modifications in work sites," such as sit-stand stations, "are common these days." CP at 1468. Ultimately, DeLapp opined that Creighton could physically perform the job within her physical limitations.

Other experts agreed. Dr. Kalb testified that Creighton was capable of obtaining and maintaining continuous and gainful employment so long as she avoided overhead work, more than

21

occasional lifting and bending, and lifting more than 35 pounds generally or more than 15 pounds frequently. Casady, an occupational and rehabilitation expert, acknowledged that Creighton could work as a customer service representative so long as she could work within the limitations her evaluations identified. For example, she testified that Creighton could alternate between sitting, walking, and standing for eight hours at a time. And, while Creighton's own vocational expert, Cohen, worried about Creighton's postural limitations, Cohen also acknowledged that accommodations would allow Creighton to "meet . . . the physical demands of the job." CP at 893. Creighton own testimony corroborated her physical ability—within limitations—to perform the job: Creighton testified that she can alternate between sitting, standing, and walking, can drive, and can sit for up to an hour, as long as she changes positions occasionally. [11]

Thus, aside from unchallenged Finding of Fact 9 being a verity on appeal, substantial evidence in the record supports the superior court's Finding of Fact 10 that the Odd Lot Doctrine did not apply because Creighton has not shown that she cannot perform light or sedentary work of a general nature. *Leeper*, 123 Wn.2d at 815.

3.      Conclusion of Law 3

Creighton challenges Conclusion of Law 3, which stated Creighton was not temporarily totally disabled from March 27, 2018 through July 10, 2019.

Finding of Fact 11 states that "Creighton was able to perform and obtain gainful employment on a reasonably continuous basis from March 27, 2018, through July 10, 2019, and

---

[11] Nor would any of Creighton's mental ailments preclude her from working as a customer service representative: the superior court found that "Creighton does not have any mental health restrictions." CP at 1983. Because Creighton did not assign error to that finding of fact, it is a verity on appeal. *Stone*, 172 Wn. App. at 260.

thereafter." CP at 1983. Creighton does not assign error to this finding; therefore, it is a verity on appeal. *Stone*, 172 Wn. App. at 260. A worker's ability "to earn a wage at any kind of reasonably continuous and generally available employment" ends any temporary disability benefits. *Hubbard*, 140 Wn.2d at 43. Therefore, Conclusion of Law 3 is supported by the findings.

4.      Conclusion of Law 5

Creighton challenges Conclusion of Law 5, which stated that Creighton was not permanently totally disabled as of July 10, 2019. Creighton relies on the testimony from Cohen, a vocational expert, to support her challenge. We hold that Creighton's challenge fails.

Here, there is no record that Creighton meets the requirements of RCW 51.08.160, which defines permanent total disability as meaning the "loss of both legs, or arms, or one leg and one arm, total loss of eyesight, paralysis or other condition permanently incapacitating the worker from performing any work at any gainful occupation." Moreover, the superior court found that Creighton did not have any mental health restrictions due to the industrial injury; is capable of performing sedentary to light-duty positions; and "was able to perform and obtain gainful employment on a reasonably continuous basis from March 27, 2018, through July 10, 2019, and thereafter." CP at 1983. Creighton does not assign error to the findings; therefore, they are verities on appeal. *Davis*, 94 Wn.2d at 123. These findings support the superior court's Conclusion of Law 5 that Creighton was not permanently totally disabled as of July 10, 2019.

5.      Conclusion of Law 6

Creighton challenges Conclusion of Law 6, which states that "[t]he Department order dated July 10, 2019, is correct and is affirmed." CP at 1983. As discussed above, Creighton fails to

demonstrate any error in the challenged findings of facts or conclusions of law. Therefore, the superior court did not err in Conclusion of Law 6.

D.    ATTORNEY FEES

Creighton assigns error to the superior court's award of attorney fees to United, but Creighton provides no discussion or citation to any legal authority supporting her challenge to the superior court's award to United. Creighton also seeks attorney fees on appeal, but only states in the conclusion of her opening brief that she should be awarded her attorney fees and costs on appeal. In her reply brief, Creighton cites to RAP 18.1 to support her request for attorney fees and costs on appeal. United requests an award of reasonable costs pursuant to RAP 14.2.

Here, the superior court awarded United "prevailing party costs" pursuant to RCW 4.84.030 and .080. CP at 1984. Creighton challenges the superior court's award to United. However, Creighton fails to provide any argument or legal basis to support her challenge to the superior court's award of costs to United. Therefore, we do not address Creighton's challenge to the superior court's award of costs to United. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

As to Creighton's request for attorney fees and costs on appeal, Creighton fails to comply with RAP 18.1, which requires appellants to dedicate a section of their opening brief to their request for fees, and to identify the source entitling them to fees. *See Hurley v. Port Blakely Tree Farms LP*, 182 Wn. App. 753, 774, 332 P.3d 469 (2014) ("RAP 18.1(b) requires 'more than a bald request for fees.'" (quoting *Richards v. City of Pullman*, 134 Wn. App. 876, 884, 142 P.3d 1121 (2006))), *review denied*, 182 Wn.2d 1008 (2015). Because Creighton did not dedicate a section of her opening brief to her request for attorney fees and costs on appeal nor did she identify a source

24

entitling her to such fees and costs, we deny Creighton's request for attorney fees and costs on appeal.[12]

As to United's requests for reasonable costs on appeal pursuant to RAP 14.2, that rule allows the award of "costs to the party that substantially prevails on review." Because United is the prevailing party on appeal, we award United its reasonable costs, which will be determined by the court commissioner.

CONCLUSION

Substantial evidence supports the challenged findings of fact, and the findings of fact support the challenged conclusions of law. Therefore, we affirm the superior court's order. Also, we affirm the superior court's award of attorney fees to United, deny Creighton's requests for attorney fees and costs on appeal, and grant United's request for reasonable costs on appeal pursuant to RAP 14.2.

---

[12] Moreover, even if Creighton had complied with RAP 18.1, Creighton is not the prevailing party and, therefore, is not entitled to attorney fees on appeal. RAP 14.2.

No. 58293-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, J.

Veljacic, A.C.J.